COLUMBIA MEDICAL CENTER SUB-SIDIARY, L.P. d/b/a North Central Medical Center, Appellant,

v.

John MEIER, Appellee.

No. 05–05–00172–CV.

Court of Appeals of Texas, Dallas.

July 21, 2006.

Diana L. Faust, Cooper & Scully, P.C., Dallas, for appellant.

James Craig Orr, Haygood, Orr & Reyes, Irving, Jason Thomas Mackey, Law

Office of Jason T. Mackey, L.L.C., Dallas, for appellee.

Before Justices FITZGERALD, FRANCIS, and LANG–MIERS.

## OPINION

Opinion by Justice LANG–MIERS.

This is a medical malpractice case. John Meier was hospitalized in the intensive care unit of Columbia Medical Center Subsidiary, L.P. d/b/a North Central Medical Center following surgeries for gallstones and bowel obstruction. While gravely ill and in the ICU, he developed a decubitus ulcer (pressure ulcer or bed sore) on his coccyx (tailbone). He sued North Central for damages, claiming North Central was negligent by failing to provide pressure relief, which proximately caused the development of the decubitus ulcer, and by failing to provide proper care and treatment for the decubitus ulcer after it was discovered. North Central argued the development of the decubitus ulcer was unavoidable and was caused by Meier's grave medical condition. The jury found in favor of Meier. On appeal, North Central argues (1) the trial court erroneously excluded evidence essential to North Central's defense, and (2) the evidence is legally and factually insufficient to support the jury's verdict. For the reasons that follow, we affirm the judgment of the trial court.

### BACKGROUND

On the night of January 2, 2001, Meier arrived at North Central's emergency room complaining of abdominal pain. He was 81 years old at the time. Meier was diagnosed with gallstones and underwent gall bladder surgery the next day. Following the surgery, Meier developed a bowel obstruction which required two additional surgeries over the next ten days.

His health began to deteriorate following the last surgery, and Meier was transferred to the ICU on January 13, 2001. Meier was diagnosed with multiple medical conditions, the most serious being adult respiratory distress syndrome, which caused his lungs to fill up with liquids and required him to be on a ventilator providing him 100 percent oxygen; septic shock, an infection in the blood that caused his heart not to pump effectively and lowered his blood pressure; and multiorgan failure. That same day, Dr. Boatman, Meier's primary treating physician, discontinued Meier's total parenteral nutrition (TPN) (tube feeding of calories, proteins, and vitamins) because he believed the TPN might aggravate Meier's failing kidneys. A "do not resuscitate" order was given. Meier was sedated, on a paralytic, and unable to turn or reposition himself.

While in the ICU, Meier developed a skin tear on his tailbone that developed into a serious decubitus ulcer. Eventually, Meier's medical condition improved and on February 6 he was transferred to Life Care Hospital of Dallas, a rehabilitation hospital. At Life Care, Meier developed decubitus ulcers on his heels. On April 19, Meier was transferred from Life Care to a VA hospital. The decubitus ulcer on his tailbone healed by August 2001. He was discharged from the VA hospital in August 2002. Meier testified that, even though the decubitus ulcer on his tailbone has healed, a portion of the wound area is hard and painful, that he experiences daily discomfort in this area, and he is no longer able to perform many of the activities he enjoyed before his hospitalization.

The jury found North Central's negligence proximately caused Meier's injuries and awarded him $35,000 for medical expenses, $135,000 for past physical pain and mental anguish, $25,000 for future pain and mental anguish, $25,000 for physical

impairment in the past, and $25,000 for future physical impairment. The trial court entered judgment in accordance with the jury's verdict.

## EXCLUSION OF MEDICAL RECORDS

In its first issue, North Central argues the trial court abused its discretion by not admitting Meier's medical records from Life Care and the related expert testimony. It argues this evidence was essential to its defense because Meier claimed that the failure by the North Central nurses to provide pressure relief every two hours caused the development of the decubitus ulcer on his tailbone. It contends the evidence was relevant to show that North Central's failure to turn him was not the proximate cause of his injuries because the Life Care medical records showed that Meier developed decubitus ulcers on his heels despite being turned every two hours while he was in that facility. North Central argues this evidence shows the ulcer was unpreventable and unavoidable. It also argues these records and the related expert testimony were the only evidence of their kind on a material issue in the case, proximate cause.

The trial court did not admit the medical records and related expert testimony because it concluded they were not relevant and had great potential for confusing and misleading the jury. The trial court told North Central the evidence was not relevant because North Central had not shown that the two incidents were identical. North Central argues the trial court applied the wrong standard to the admissibility of those records because the incidents did not have to be identical to be relevant. It argues the trial court's exclusion of the evidence probably caused the rendition of an improper judgment.

## A. Standard of Review

The trial court has discretion in deciding whether to admit or exclude evidence. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex.2001); *Gibson v. Ellis*, 126 S.W.3d 324, 332–33 (Tex. App.-Dallas 2004, no pet.). A trial court abuses its discretion when it acts in an arbitrary and unreasonable manner, or when it acts without reference to any guiding principles. *See Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex.1991); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). Even if we find error, and before we will reverse a case based on an evidentiary ruling, appellant must show the evidence was controlling on a material issue and was not cumulative. *See Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex.2000) (successful challenge to evidentiary ruling requires complainant to show judgment turned on particular evidence excluded or admitted); *Williams Distrib. Co. v. Franklin*, 898 S.W.2d 816, 817 (Tex.1995); *Mentis v. Barnard*, 870 S.W.2d 14, 16 (Tex. 1994) (excluded testimony of accident reconstruction expert would have addressed central issue of comparative negligence and expert's noncumulative calculations and opinions were controlling, though not conclusive, on whether excessive speed caused death); *Brookshire Grocery Co. v. Smith*, 99 S.W.3d 819, 823 (Tex.App.-Beaumont 2003, pet. denied) (falsified answer on job application did not directly address elements of negligence action and therefore not controlling on a material issue). We will uphold a trial court's ruling if it is correct under any legal theory. *See Custom Leasing, Inc. v. Tex. Bank & Trust Co. of Dallas*, 516 S.W.2d 138, 142 (Tex. 1974); *Seaman v. Seaman*, 425 S.W.2d 339, 341 (Tex.1968).

## B. Applicable Law

Relevant evidence is generally admissible. TEX.R. CIV. EVID. 402. An

unrelated incident may be relevant and admissible if it and the incident involved in the lawsuit occurred under reasonably similar circumstances, the two incidents are connected in a special way, or the incidents occurred by means of the same instrumentality. *See Mo. Pac. R.R. Co. v. Cooper*, 563 S.W.2d 233, 236 (Tex.1978); *Brookshire Bros. v. Wagnon*, 979 S.W.2d 343, 348 (Tex.App.-Tyler 1998, pet. denied); *McEwen v. Wal–Mart Stores, Inc.*, 975 S.W.2d 25, 29 (Tex.App.-San Antonio 1998, pet. denied). "Reasonably similar" generally means the same type of occurrence. *Huckaby v. A.G. Perry & Son, Inc.*, 20 S.W.3d 194, 201 (Tex.App.-Texarkana 2000, pet. denied). The burden to show the incidents are reasonably similar, but not necessarily identical, is on the proponent of the evidence. *See Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 138 (Tex.2004); *see also E–Z Mart Stores, Inc. v. Terry*, 794 S.W.2d 63, 65 (Tex.App.-Texarkana 1990, writ denied). Evidence of similar incidents, even if relevant, is inadmissible if it creates undue prejudice or confusion. TEX.R. CIV. EVID. 403; *Armstrong*, 145 S.W.3d at 138.

### C. Analysis

■ North Central argues the medical records from Life Care and the related expert testimony were relevant to prove its negligence was not a proximate cause of Meier's injuries because they show Meier would have developed the decubitus ulcer even if North Central's nurses had turned him every two hours. North Central offered the Life Care medical records through plaintiff's expert Nurse Simmons and through its own experts, Dr. Barnett and Dr. Brem.

### 1. Reasonably Similar Standard

Debora Simmons, a senior clinical quality analyst at University of Texas M.D. Anderson Cancer Center in Houston, testified as a nursing expert for Meier. Nurse Simmons stated that her job involves reviewing and writing policies and procedures for the hospital and instructing undergraduate nurses at Texas Women's University. She is certified by the American Association of Critical Care Nurses in bedside nursing and is an advanced practice nurse, licensed as a clinical nurse specializing in acute and critical care. Although North Central made an offer of proof for the Life Care medical records through Nurse Simmons, she did not testify that the conditions at Life Care were reasonably similar to the conditions at North Central or that Meier's condition was reasonably similar at both facilities.

North Central also offered Life Care's medical records through its two medical experts, Dr. Barnett, an internal medicine physician, and Dr. Brem, who testified he runs the wound healing center at Columbia University Medical Center and that his job involves teaching, research, and treating patients concerning all aspects of wound care. Both arguably testified that Meier's medical condition was reasonably similar at both facilities. But they did not offer any evidence that the conditions at Life Care were reasonably similar to the conditions at North Central. For example, there was no testimony comparing North Central's facilities to Life Care's facilities, such as quality of care, the type of care, the support surfaces used, the nursing staff, or how the development of decubitus ulcers on the heels was reasonably similar to the development of a decubitus ulcer on the tailbone. Dr. Barnett testified that the fact that Meier developed heel ulcers while at Life Care, despite the use of pads and boots, reinforced his opinion that the ulcer he developed at North Central was unavoidable. But he also testified he did not review the records to know what the nurses did or did not do each day at Life

Care. In short, North Central's offers of proof did not establish the incidents were reasonably similar. *See Huckaby*, 20 S.W.3d at 201; *Armstrong*, 145 S.W.3d at 138. As a result, North Central did not prove the Life Care records and the related expert testimony were relevant to show its negligence did not proximately cause Meier's decubitus ulcer on his tailbone.

### 2. Potential to Confuse and Mislead

The trial court also did not admit the Life Care medical records and the related expert testimony because of the great potential to confuse and mislead the jury. *See* Tex.R. Civ. Evid. 403. North Central cited the standard for our review of a trial court's decision not to admit relevant evidence under Rule 403. *See LSR Joint Venture No. 2 v. Callewart*, 837 S.W.2d 693, 698 (Tex.App.-Dallas 1992, writ denied). And it argued the evidence was "highly probative." But North Central did not argue or cite any authority to show the probative value of the evidence outweighed the potential to confuse and mislead the jury. *See* Tex.R. Civ. Evid. 403. As a result, North Central presents nothing for our review on this issue. *See* Tex.R.App. P. 38.1.

### 3. Controlling Evidence

Even if the Life Care medical records and the related expert testimony were relevant and admissible under rule 403, North Central did not prove the evidence was controlling on the issue of proximate cause and was not cumulative. Several other witnesses testified that decubitus ulcers can develop regardless of the care given to the patient. For example, Nurse Simmons testified on cross-examination that she saw in the records where Meier developed decubitus ulcers on his heels after he was transferred to Life Care. And North Central's experts testified at length that Meier's medical conditions caused him to be at high risk for developing a decubitus ulcer despite being provided the best care. Witnesses for both parties testified that, despite the best care, the development of decubitus ulcers in some patients is unavoidable. One of Meier's ICU nurses testified she had patients develop decubitus ulcers on their tailbones despite being turned every two hours. Meier's own experts testified that not all decubitus ulcers are preventable. Dr. Heber agreed that unpreventable ulcers can occur in the aged and terminally ill and that no amount of attention or skill from the caregiver can avert the occurrence of decubitus ulcers. He agreed that a preventable decubitus ulcer is one that occurs in low-risk patients and that the appearance of decubitus ulcers in the elderly and sick is not a measure of the quality of care that a patient received. Dr. Heber agreed that the development of decubitus ulcers can be part of multiple organ failure that accompanies the terminally ill and elderly.

In light of this testimony, North Central did not show how the Life Care records were controlling on the issue of proximate cause or how those records were not cumulative of other evidence. We conclude the trial court did not abuse its discretion by not admitting the Life Care medical records and the related expert testimony and, even if it was error, the error was harmless. We overrule North Central's first issue.

### SUFFICIENCY OF THE EVIDENCE

In its second issue, North Central challenges the legal and factual sufficiency of the evidence that North Central's negligence proximately caused Meier's injuries.

### A. Standards of Review

When an appellant attacks the legal sufficiency of the evidence to support

an adverse finding on an issue on which it did not have the burden of proof, appellant must demonstrate there is no evidence to support the adverse finding. *See Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). In evaluating the legal sufficiency of the evidence to support a finding, we must determine whether the evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005); *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002). We sustain a no-evidence point only if there is no more than a scintilla of evidence proving the elements of the claim. *St. Joseph Hosp.,* 94 S.W.3d at 520. In making this determination, we must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller,* 168 S.W.3d at 807.

■ In reviewing a factual sufficiency challenge, we consider and weigh all of the evidence in support of and contrary to the finding, and will set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Bellino v. Comm'n for Lawyer Discipline,* 124 S.W.3d 380, 385 (Tex.App.-Dallas 2003, pet. denied). In making this review, we are not a fact finder and we do not substitute our judgment for that of the jury, even if a different answer could be reached on the evidence. *St. Paul Medical Center v. Cecil,* 842 S.W.2d 808, 814 (Tex.App.-Dallas 1992, no writ). It is well established that the jury weighs the evidence, assesses the credibility of witnesses, and resolves conflicts and inconsistencies. *Id. See Dallas County v. Holmes,* 62 S.W.3d 326, 329 (Tex.App.-Dallas 2001, no pet.); *Tex. Farmers Ins. Co. v. Cameron,* 24

S.W.3d 386, 392 (Tex.App.-Dallas 2000, pet. denied).

### B. Applicable Law

■ In a medical malpractice case, a plaintiff must show (1) a legal duty, (2) a breach of that duty, and (3) damages proximately caused by the breach. *IHS Cedars Treatment Ctr. of DeSoto v. Mason,* 143 S.W.3d 794, 798 (Tex.2003). North Central challenges only the jury's finding of proximate cause. The two elements of proximate cause are (1) cause in fact and (2) foreseeability. *Id.* North Central does not challenge the element of foreseeability, so we limit our discussion to the first prong of the analysis—cause in fact. Cause in fact is established when the negligent act or omission was a substantial factor in bringing about the injuries and, without it, the harm would not have occurred. *Id.* at 799; *Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex. 1995). Mere conjecture, speculation, or possibility is insufficient to establish cause in fact. *Duff v. Yelin,* 751 S.W.2d 175, 176 (Tex.1988). In a medical malpractice case, proximate cause must be established by expert testimony based on a reasonable medical probability unless the matter is within the experience of a layperson. *Pack v. Crossroads, Inc.,* 53 S.W.3d 492, 500 (Tex.App.-Fort Worth 2001, pet. denied). No one disputes that expert testimony was required in this case.

### C. Analysis

■ Nurse Simmons explained the various methods for providing pressure relief to a patient, including turning a patient or repositioning the patient if the patient will not tolerate a full turn. She explained that repositioning involves using foam wedges or pillows to elevate a particular part of the body. Additionally, if a patient cannot be turned or repositioned, Simmons

stated there are specialty beds specifically designed to provide pressure relief by rotating patients very slowly.

Simmons testified that nurses should document why a patient cannot be turned and not just say "the patient can't be turned." In reviewing medical records, she expects to see that the nurses tried to turn the patient and documented in the chart the problems that resulted, such as a drop in blood pressure or increase or decrease in heart rate, and that moving was detrimental to the patient. Simmons stated the most important reason for the documentation is to communicate the patient's status with other members of the health care team. She also stated that a nurse's assessments are ways of communicating with each other and with other members of the team about what the nurse saw during that shift. A proper assessment of a wound would allow someone reading it to draw a picture of exactly what the nurse saw just from the words used in the assessment, such as color, location, size, depth, presence or absence of infection, whether tissue was dead or perfuse. She testified a proper written assessment is essential because nurses care for so many patients they cannot be expected to remember everything they did with a particular patient.

Simmons reviewed North Central's policies and protocols and testified it requires its nurses to provide pressure relief at least every two hours. She testified there was no documentation of an attempt to provide Meier any form of pressure relief between January 13 and January 16, when the skin tear was discovered, except at 4 p.m. and 6 p.m. on January 14. She pointed out times in the medical records when she believed it would have been appropriate to turn Meier. In their depositions, which Simmons reviewed in formulating her opinion, the North Central nurses stat-

ed they had no independent recollection of Meier or what they did or did not do in a particular instance. As a result, because it was not documented, Simmons could only conclude the nurses did not attempt to turn or reposition Meier during those days except as noted in the chart. Simmons testified the failure to provide pressure relief was a violation of North Central's policies and a failure to act as a reasonably prudent nurse. In Simmons's opinion, the decubitus ulcer on Meier's tailbone was directly caused by the failure of the ICU nurses to provide pressure relief from January 13 through January 16.

Simmons also testified the records contained no documentation that the nurses used the interventions that would have prevented the ulcer from getting worse once it was discovered. She stated the medical records indicate a nurse discovered a skin tear on Meier's tailbone in the early morning hours on January 16. She said, and other experts agreed, that a doctor should have been advised of the skin tear sometime on January 16. But the records do not show a doctor was notified before January 17. The doctor ordered a skin consult and a specialty bed. Between the time the skin tear was discovered and the wound care nurse arrived three days later, the only documentation concerning care of the wound was that a nurse applied a no-rinse wash and a moisture barrier but no bandage. By the time the wound care nurse arrived, the skin tear had progressed to a serious decubitus ulcer. She ordered daily dressing of the wound to consist of "cleans[ing] with Safe Cleanse, dry, apply 3M No Sting skin prep to perineum skin, cover the wound … bed with Nu–Gel, cover[ ] with Hydrasorb Foam, secure with Medipore tape. May use Safe Gel to the wound bed until Nu–Gel is available." Nurse Simmons testified that in her review of the medical records, she saw only one occasion when the wound care nurse's

orders were followed. She testified that the wound care nurse's orders were not entered into Meier's "care plan," one of the tools nurses use to tell them what to do concerning a particular patient, until January 28, despite it being ordered on January 19. And her review of the North Central nurses' depositions revealed that none of the nurses had an independent recollection that they changed the dressing as ordered. Based on her review of the records, the interventions that would have prevented Meier's decubitus ulcer from getting worse and would have healed the ulcer were not provided.

Dr. Heber, a physician expert for Meier, testified by deposition. He stated that the major cause of decubitus ulcers is unrelieved pressure over bony prominences and that a patient with Meier's conditions should be turned frequently to prevent skin breakdown and mobilize secretions. In a patient with poor respiratory status, Dr. Heber testified the patient should be turned more frequently because it helps to mobilize the secretions. And in a patient like Meier, not turning him was contraindicated.

North Central argues Dr. Heber's testimony will not support the jury's finding of proximate cause because he agreed that he could not rule out the possibility that Meier's decubitus ulcer was unpreventable. He testified:

> Q: And similarly, you can't rule out the possibility that this was an unpreventable decubitus ulcer, correct?
>
> A. Unpreventable. The only way I can say that it was unpreventable is if everything was done in a standard fashion to prevent it and it occurred. But since everything wasn't done in a standard fashion, not—not something over and above the standard treatment to prevent it but standard nursing practices and—

> to prevent it and it occurred, I can't—I can't say that.
>
> Q. Okay. I guess to rephrase my question and put it succinctly, you can't rule out the possibility that this was unpreventable; fair?
>
> A. Fair.

In contrast, North Central's experts all testified Meier would have developed the decubitus ulcer, even if North Central had turned Meier every two hours, because of his overall general medical condition.

Dr. Barnett discussed Meier's serious medical conditions and estimated Meier had a greater than ninety percent chance of dying while in the ICU. In his opinion, Meier could not be turned safely during the first thirty hours in the ICU because of his overall status, fluid in his lungs, adult respiratory distress syndrome, poor oxygenation, low blood pressure, and because he was on a ventilator with maximum support. According to Dr. Barnett, "[t]here has got to be a reason why they didn't turn him, and it was they used common sense [sic], saw a patient who is very critical, very tenuous, and felt that it was not safe to turn him at that time. It might compromise and probably would have compromised his status."

Dr. Barnett testified the nurses did not ignore Meier's skin integrity and documented other methods they used to protect Meier's skin in a safe manner. However, he agreed that the fact that Meier developed a breakdown in the skin on his tailbone was strong evidence that pressure relief was not performed in that area. He also testified that, according to his review of the medical records, the nurses changed Meier to a different type of bed to reduce pressure before the skin tear was noted. But the medical records indicate Meier was not placed on the special bed until after the ulcer developed. He also agreed that Meier could have been placed on the

special bed when he was first admitted to the ICU. Dr. Barnett did not dispute that, according to the records, the nurse that came on duty after the skin tear was discovered documented the skin texture as normal, said there was no skin breakdown, and did not comment at all about the wound. When she made another assessment two hours later, she again said the skin texture was normal and there was no skin breakdown.

North Central asked Dr. Barnett whether he had ever treated a patient in the ICU who was so unstable that the nurses could not reposition the patient. He related the story about a woman who was so ill that when they tried to move her, her pressure dropped, her respiratory rate jumped up, and she "literally expired." They wrote orders to "[d]o not stimulate" because they could not do it safely. He testified that the records here do not show the nurses attempted to move Meier and problems resulted. Instead, the nurses documented that Meier was not turned because of unstable vital signs, but did not document why, such as that they tried to turn him and his blood pressure dropped, or he suffered some other problem that made it inappropriate to turn him.

Based on his review of the records, Dr. Barnett believed the nurses did everything they could safely do to prevent and treat Meier's ulcer. But he also testified the failure to provide pressure relief "certainly did contribute to the development of the ulcer." On cross-examination, Dr. Barnett admitted that when he reviewed the medical records and prepared his report, he was still practicing in the North Central ICU. He also agreed the medical records showed the wound care nurse's orders were not documented as being followed on January 20, 22, 23, 26, 28, or 29 and that the wound care order was first entered into Meier's care plan on January 28.

Dr. Brem testified no one knows exactly what causes a decubitus ulcer, but when a person is in shock and has adult respiratory distress syndrome, there is decreased blood flow to the tailbone. He said there was nothing medically the ICU nurses could have done to prevent Meier's ulcer. But in explaining how to prevent a decubitus ulcer, he stated "it's a matter of early recognition and treatment." Although people will develop ulcers, regardless of treatment, Dr. Brem said "that doesn't mean you shouldn't turn them ... You have to do everything for every patient, but people will still develop them." Dr. Brem testified he had never seen a picture of Meier's decubitus ulcer. In his opinion, it was unavoidable.

Paige Brinegar also testified for North Central as a nursing expert. She testified she did not see any data in the records to support the conclusion that Meier's decubitus ulcer was preventable. She believed the ulcer was not preventable, regardless of whether Meier had been turned, because Meier was hemodynamically unstable, his albumins were low, he was edematous, of an advanced age, and his kidneys were failing. She testified that the nurses put Meier through an "active range of motion," which, in her opinion, was enough to re-perfuse an area. She also testified that the nurse's assessment on January 14 that Meier was unable to be turned due to unstable vital signs was a proper assessment.

In summary, there was expert testimony that no attempt was made to turn Meier during the first 32 hours in the ICU. The testimony was inconsistent regarding whether Meier was too unstable to turn. There was also testimony that a special bed designed to provide pressure relief was not ordered until after Meier developed the decubitus ulcer, even though it could have been ordered when he was first

admitted to the ICU. Although Dr. Barnett testified he believed Meier's decubitus ulcer was unpreventable, he also testified that the nurse's failure to provide pressure relief contributed to its development. And he admitted that when he formulated his opinion, he was still working at North Central.

The experts agreed that when the skin breakdown was first discovered on January 16, it was documented as a skin tear. And that for the next two days, there is no documentation that the nurses provided any dressing change to the skin tear. Three days later, the wound care nurse entered an order for daily care and treatment of the wound, which by this time had progressed to a serious decubitus ulcer. Experts on both sides agreed that the records do not indicate the order was followed except on one day. And it was undisputed the wound care nurse's order was not entered into Meier's care plan until January 28, although the order was issued on January 19. Neither Dr. Barnett nor Dr. Brem offered any testimony about whether the nurses could have stopped the progression of the ulcer if they had provided proper care of the ulcer once it was discovered. But Dr. Brem testified that prevention of decubitus ulcers is a matter of early detection and treatment. Nurse Simmons testified the nurses did not use interventions that would have prevented the ulcer from getting worse.

It was the province of the jury to resolve inconsistencies in the experts' testimonies and judge the credibility of the witnesses. *Cecil,* 842 S.W.2d at 814. Having reviewed the evidence under the appropriate standards, we conclude the evidence is both legally and factually sufficient to support the jury's finding that North Central's negligence proximately caused Meier's injuries.

We overrule North Central's second issue.

### CONCLUSION

We conclude the trial court did not abuse its discretion by not admitting the Life Care medical records and the related expert testimony and, even if error was shown, it was harmless because North Central did not show that the two incidents were reasonably similar or that the evidence was controlling and not cumulative of other evidence. We further conclude the evidence is legally and factually sufficient to support the jury's verdict. Accordingly, we overrule North Central's issues and affirm the judgment of the trial court.