**AFFIRM and Opinion Filed February 13, 2013**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-10-01545-CV

### WENDY CREECH, INDIVIDUALLY, AS ADMINISTRATOR OF THE ESTATE OF DONALD CREECH, JR., DECEASED, AND AS NEXT FRIEND OF BILLIE CREECH, A MINOR, JERIMIAH CREECH, DONALD CREECH, AND JANET GIFFORD, Appellants
### V.
### COLUMBIA MEDICAL CENTER OF LAS COLINAS SUBSIDIARY, L.P. D/B/A LAS COLINAS MEDICAL CENTER, ANTONETTE CONNER, AND ANNA MATHEW, Appellees

---

### On Appeal from the 160th Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. 02-05307-K

---

## OPINION

Before Justices O'Neill, FitzGerald, and Lang-Miers
Opinion by Justice FitzGerald

This is a wrongful-death case involving alleged medical malpractice. The jury returned a verdict in favor of defendants, and the trial judge rendered a take-nothing judgment. Plaintiffs appeal, arguing that the jury's verdict was against the great weight and preponderance of the evidence and that the expert testimony regarding causation offered by defendants was of no probative value. We affirm.

## I. BACKGROUND

**A.     Facts**

The evidence adduced at trial supported the following facts.  In October 2001, Donald Creech, Jr. (Creech) was 41 years old.  On October 19, 2001, Creech was experiencing severe pain, apparently from a kidney stone.  He had suffered from kidney stones in the past.  He went to Las Colinas Medical Center (sometimes referred to herein as the hospital) for treatment.  He was treated in the emergency room by Dr. Elizabeth Lacy, who observed that Creech was suffering from left flank pain and diagnosed him with a kidney stone.  The stone was later confirmed by CT scan.  After a medication called Toradol failed to relieve Creech's pain, Dr. Lacy prescribed an opioid analgesic called Dilaudid, which is more potent than morphine.  Under Dr. Lacy's order, Creech could receive two to four milligrams of Dilaudid by IV every two hours as needed for pain.  Creech was admitted to the hospital the evening of the 19th.  At that time he came under the care of a urologist, Dr. Ali Shirvani.  Dr. Shirvani left the Dilaudid order in place for the duration of Creech's stay.

During the night of October 19, Nurse Layne Wilson-Cox observed that Creech made a "snarfling snore" noise while he slept and believed that he might have sleep apnea.  She had a respiratory therapist, Jack Carpenter, test Creech's blood-oxygen levels, and those levels were low.  They contacted Dr. Shirvani during the night, and he ordered that Creech be put on "O2 protocol," which meant that Creech was to be given additional oxygen through a nasal cannula or tube for the rest of his hospital stay, except when he was up and walking.

On October 20, Dr. Shirvani saw and evaluated Creech at around 8:00 a.m.  Around mid-morning, Dr. Shirvani talked to a respiratory therapist, Kyle Chandler, who recommended contacting a neurologist and sleep specialist named Dr. Rabia Khan to see if she wanted to do a sleep study on Creech.  Chandler saw Dr. Khan later that day and told her about Creech, and she

2

visited with Creech personally that evening. They discussed having him make an appointment for a sleep study with Dr. Khan's office.

The night of October 20–21, Nurse Antonette Conner was the charge nurse, and Nurse Anna Mathew was the nurse specifically assigned to Creech's care. Conner was a licensed registered nurse. Mathew was a licensed vocational nurse. Mathew gave Creech 2 milligrams of Dilaudid at 7:45 p.m. Creech reported severe pain again at 10:05 p.m., and at that time Mathew gave him 4 milligrams of Dilaudid. Mathew testified that she saw Creech again at midnight when she changed his IV bag, and he was fine at that time. Conner also testified that she checked on Creech at midnight and that he was snoring so loudly that she closed the door of a neighboring patient's room. A different nurse, Betty Lloyd, testified that she saw Creech walking in the hall and asking for something to drink roughly between midnight and 12:30 a.m. At 1:30 a.m., Nurse Mathew found Creech unresponsive, and a Code was initiated. Emergency resuscitative measures were unavailing, and Creech was pronounced dead at 3:10 a.m.

An autopsy was performed on October 22 by Dr. Yuenan Shen, with the participation of Dr. David Dolinak. Dr. Dolinak was the deputy chief medical examiner for Dallas County. The autopsy report was admitted into evidence. It was signed by both doctors and contained the following conclusion: "Based upon the history and the autopsy findings, it is our opinion that Donald Creech . . . died as a result of hypertensive-type cardiac hypertrophy. Obesity and bronchopneumonia likely contributed to his death." Deposition testimony by Dr. Dolinak was played for the jury in which he explained that, in his opinion, Creech suffered an arrhythmia that resulted in a heart attack. He also opined that Dilaudid was not related to Creech's death in any way.

**B.      Procedural history**

Creech's surviving family members filed this wrongful-death lawsuit in 2002. At the time of trial in 2004, defendants were Dr. Shirvani, Dr. Khan, respiratory therapists Carpenter and Chandler, and the three appellees (the hospital, Conner, and Mathew). Each side called multiple expert witnesses at trial. One of the contested fact issues was the actual cause of Creech's death. Plaintiffs' theory was that Creech died from oxygen deprivation brought on by a combination of obstructive sleep apnea and the administration of an amount of Dilaudid that prevented Creech from waking up during an apneic episode. Defendants' theory was that Creech died from a cardiac event that was not related to the administration of Dilaudid. Question 1 of the jury charge asked, "Did the negligence, if any, of those named below proximately cause the death of Donald Creech, Jr.?" The jury answered "No" as to every defendant.

Plaintiffs filed a motion for new trial, and the trial judge signed an order granting a new trial as to Nurse Mathew, Nurse Conner, and the hospital with respect to its vicarious liability for the nurses' conduct. The judge denied the motion for new trial as to the doctors and respiratory therapists. The judge later signed a take-nothing judgment in favor of the doctors and respiratory therapists, and also in favor of appellee Las Colinas Medical Center with respect to all direct and vicarious claims based on the conduct of Carpenter and Chandler. The judge severed those claims out to make the judgment final.

Meanwhile, the hospital and the nurses sought mandamus relief with respect to the order granting plaintiffs a new trial. The supreme court granted some of the relief they sought, concluding that the trial judge had to specify his reasons for disregarding the jury's verdict and granting a new trial. *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 213 (Tex. 2009) (orig. proceeding). By this time, a new trial judge had taken the bench in the relevant court. He recused himself, and the case was transferred to a different trial court.

4

The judge of that court denied plaintiffs' motion for new trial and signed a take-nothing judgment in favor of the hospital and the nurses. Plaintiffs appealed.

## II. ANALYSIS

In their first issue on appeal, appellants argue that the trial judge erred by denying their motion for new trial because the jury's findings in favor of appellees were against the great weight and preponderance of the evidence. In their second issue on appeal, and in further support of their first issue, appellants argue that all expert testimony by Dr. Dolinak and by appellees' expert witnesses as to the cause of Creech's death was speculative, conclusory, and without probative value. They argue both issues together.

### A. Applicable law and standard of review

Appellants' claims against appellees are health care liability claims sounding in negligence. The elements of such claims are (1) a legal duty, (2) a breach of that duty, and (3) damages proximately caused by the breach. *Columbia Med. Ctr. Subsidiary, L.P. v. Meier*, 198 S.W.3d 408, 414 (Tex. App.—Dallas 2006, pet. denied). The standard of care for a health care provider is what an ordinarily prudent health care provider would do under the same or similar circumstances. *Simonson v. Keppard*, 225 S.W.3d 868, 871 (Tex. App.—Dallas 2007, no pet.). Proximate cause encompasses foreseeability and cause in fact. *Meier*, 198 S.W.3d at 414. Cause in fact is established if the negligent conduct was a substantial factor in bringing about the injuries and, without it, the harm would not have occurred. *Id*. In a medical-malpractice case, the plaintiff ordinarily must produce expert testimony to establish both the applicable standard of care and proximate causation if those matters are not within the experience of a layperson. *See Ethicon Endo-Surgery, Inc. v. Gillies*, 343 S.W.3d 205, 212 (Tex. App.—Dallas 2011, pet. denied) (standard of care); *Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010) (proximate cause). No one disputes that expert testimony was required as to these elements in this case.

5

When an appellant appeals the factual sufficiency of the evidence supporting an adverse finding on an issue on which the appellant had the burden of proof, he must show that the adverse finding is against the great weight and preponderance of the evidence. We must consider and weigh all of the evidence, and we set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that the verdict is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam); *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 722 (Tex. App.—Dallas 2011, pet. denied). We may not reverse merely because we conclude that the evidence preponderates toward an affirmative answer. *Kirkpatrick v. Mem'l Hosp. of Garland*, 862 S.W.2d 762, 772 (Tex. App.—Dallas 1993, writ denied). The factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Wagner v. Edlund*, 229 S.W.3d 870, 874 (Tex. App.—Dallas 2007, pet. denied); *see also Thota v. Young*, 366 S.W.3d 678, 695 (Tex. 2012) (noting that jury is entitled to give weight to expert testimony even if given by a party to the case). If reasonable minds could differ as to the inferences and conclusions to be drawn from the evidence, we may not substitute our judgment for that of the factfinder. *Wagner*, 229 S.W.3d at 874. When we conclude that a finding is against the great weight and preponderance of the evidence, we must detail the relevant evidence and state how the contrary evidence greatly outweighs the evidence in support of the verdict. *PopCap Games, Inc.*, 350 S.W.3d at 722.

An appellant must attack all independent bases or grounds that fully support a judgment. *Oliphant Fin. LLC v. Angiano*, 295 S.W.3d 422, 423 (Tex. App.—Dallas 2009, no pet.). In this case, the jury may have answered question 1 "No" as to each appellee because the jury refused to find that a breach of the standard of care, because the jury refused to find that any breach

6

proximately caused Creech's death, or both. Accordingly, appellants' burden in this case is to demonstrate that both refusals to find were against the great weight and preponderance of the evidence. *See Townsel v. Dadash, Inc.*, No. 05-10-01482-CV, 2012 WL 1403246, at *4–5 (Tex. App.—Dallas Apr. 24, 2012, no pet.) (mem. op.); *Faust v. BNSF Ry. Co.*, 337 S.W.3d 325, 338 (Tex. App.—Fort Worth 2011, pet. denied).

## B. Sufficiency of the evidence as to breach of the standard of care

Appellees argue that appellants have failed to brief the sufficiency of the evidence as to the element of breach of the standard of care, and that we should affirm on that basis alone. Although appellants' brief focuses much more heavily on the evidence concerning the cause of Creech's death, we conclude that it adequately addresses appellees' alleged breaches of the standard of care as well. Appellants assert that appellees breached the standard of care in the following respects: (1) Nurse Mathew was inadequately trained about the side effects of Dilaudid and inadequately supervised when she administered Dilaudid to Creech; (2) Nurse Mathew and Nurse Conner failed to follow the physician's order that Creech stay on oxygen when he was not up and walking, and (3) the hospital did not follow its own protocols and did not make sure that Creech's blood oxygen levels were monitored, especially during sleep.

### 1. Appellants' evidence

Appellants adduced some evidence that the nurses and the hospital breached the standard of care. For example, Nurse Mathew testified that she never saw Creech wearing his oxygen nasal cannula the night of October 20. Dr. Shirvani testified that he expected Creech to be covered with oxygen during his whole hospital stay when he wasn't ambulating. An expert witness, Dr. John Seifert, testified that Dr. Shirvani's order that Creech remain on oxygen by cannula throughout his hospitalization should have been followed. A toxicologist, James

Garriott, Ph.D., testified that 2 mg is the maximum safe dose of Dilaudid, and that 4 mg, which Nurse Mathew gave Creech, was an overdose.

Dr. Todd Swick, a neurologist and sleep-disorder specialist, testified that the nurses breached the standard of care in several respects. He testified that they were negligent by failing to properly monitor Creech, by failing to treat the underlying causes of his low blood-oxygen levels, and by failing to prevent future problems because of those levels. He also testified that, based on her qualifications, Nurse Mathew should not have been allowed to determine how much Dilaudid to give Creech, that she gave him too much Dilaudid when she gave him the 4 mg dose, and that she had no knowledge of the medication she was giving or Creech's obstructive sleep apnea, in violation of the standard of care. Dr. Swick also testified that the nurses were negligent in their observation of Creech, that Nurse Mathew was negligent in giving him the Dilaudid, and that the nurses were negligent by not continuously monitoring Creech's blood oxygen with a pulse oximeter. A pulse oximeter is a small, portable device that is clipped onto a body part, such as a finger or ear, and that measures the patient's blood-oxygen saturation levels. He also testified that the nurses should have made sure that Creech was treated with a CPAP, or continuous positive airway pressure, device, either with or without a physician's order.

### 2. Appellees' evidence

On the other hand, several witnesses supplied evidence that the nurses and hospital did not breach the standard of care. Nurse Mathew testified that she knew what constituted reasonable and appropriate care and that her nursing care of Creech was reasonable and appropriate. She also testified that she assessed Creech before medicating him each time she gave him Dilaudid, that it was safe to give it to him, and that she would not have given it to him if she had thought it was unsafe. Nurse Mathew testified that she did not replace Creech's nasal cannula during the night of October 20 because she did not think he needed it; she further

8

explained that his breathing and color were good and he showed no distress. Nurse Conner, on the other hand, testified that she saw Creech wearing his oxygen at midnight. She also testified that the physician's order to maintain oxygen delivery to Creech was complied with because he had it on when he needed it on.

Nurse Conner testified that her supervision of Nurse Mathew was reasonable and appropriate. She testified that Nurse Mathew was competent and qualified to take care of Creech, and that she herself assessed Creech more than once during her shift the night of October 20. Both nurses testified that they never saw Creech have any respiratory difficulties prior to the time he was found unresponsive. Appellees' retained expert Lynn Patterson, who was a registered nurse, testified that both Nurse Mathew and Nurse Conner met the standard of care in this case. She explained that they assessed Creech as needed, and that Conner appropriately supervised Mathew by being available to answer any questions Mathew had. Nurse Patterson also testified that Mathew acted appropriately by assessing Creech before administering the 4 mg of Dilaudid that she gave him at 10:05 p.m. on October 20, and that Mathew's employment file indicated that she was qualified to administer medications.

Other evidence also supported the proposition that appellees were not negligent. Dr. Douglas Jenkins, a specialist in internal medicine and pulmonology, testified that none of the health-care providers involved in this case was negligent. He further testified that in his opinion, Creech was properly cared for and monitored during his hospitalization. A urologist, Dr. Melvyn Anhalt, also testified that he had no criticisms of the care provided by the hospital or its employees. Dr. Gregory Carter, who specialized in neurology and sleep medicine, testified that the hospital acted within the standard "as prudent hospital nurses and respiratory therapists." He further opined that it was within Mathew's professional judgment to give Creech 4 mg of

9

Dilaudid because that dosage was within the physician's order and Creech had gotten only a couple of hours of pain relief from the prior dose of Dilaudid.

Brigid Byrne, who had a Ph.D. in education with a concentration in gerontology, testified that Mathew was capable of assessing whether to increase Creech's dosage of Dilaudid from 2 mg to 4 mg based on factors such as the increasing severity of pain reported by Creech and the shortening length of time the doses of Dilaudid appeared to be giving him relief. She also testified that Dilaudid is "perfectly safe" to give patients with sleep apnea. She also testified that Mathew should have evaluated Creech before giving him Dilaudid and determined what intervention was necessary within the scope of the order. There was evidence that Mathew evaluated him at 10:05 p.m. and then checked on him about fifteen to thirty minutes later, and she found that he was breathing fine. She also assessed him at midnight and found that he was asleep; although he was snoring, his respiration was unlabored and he was doing fine.

### 3. Analysis of the sufficiency of the evidence

We conclude that the jury's refusal to find a breach of the standard of care by the nurses and hospital was not against the great weight and preponderance of the evidence in this case. The record contains conflicting evidence on appellants' various theories of breach. Dr. Swick testified that Nurse Mathew was not qualified to decide how much Dilaudid to administer to Creech, but Nurse Patterson testified that she was qualified to administer medications, and Byrne testified that she believed Mathew was capable of assessing whether to give Creech 4 mg of Dilaudid. Nurse Conner also testified that Mathew was competent to give patients intravenous narcotics. This issue was for the jury to decide. *See Kirkpatrick*, 862 S.W.2d at 772 ("It is particularly within the jury's province to weigh opinion evidence and the judgment of experts."). Dr. Swick also testified that a qualified nurse or registered nurse should have supervised Mathew's administration of Dilaudid at 10:05 p.m. on October 20. But Nurse Conner testified

10

that ordinarily an LVN does not have to be supervised by an RN when administering a narcotic drug by IV, and Byrne also testified that an LVN can give an intravenous medication that is within the parameters of a doctor's order without being supervised during a particular administration. The jury could have accepted appellees' evidence on this point as well.

As for monitoring, Dr. Swick testified that the nurses negligently failed to properly monitor Creech. He also testified that the nurses should have continuously monitored Creech's blood oxygen with a pulse oximeter and should have made sure Creech was treated with a CPAP device to overcome and protect against his apparent sleep apnea. On the other hand, Nurse Mathew testified that she gave Creech reasonable and appropriate nursing care. Nurse Patterson testified that Mathew and Conner met the standard of care and assessed Creech as needed. Dr. Jenkins testified that Creech was properly cared for and monitored during his hospitalization, and that continuous pulse oximetry and use of a CPAP device were not indicated. Dr. Anhalt also testified that Creech did not need to be monitored with pulse oximetry or treated with a CPAP device. It was not against the great weight of the evidence for the jury to reject this theory of negligence.

Dr. Garriott testified that the 4 mg dose of Dilaudid that Nurse Mathew gave Creech was an overdose, and Dr. Swick also testified that Nurse Mathew gave Creech too much Dilaudid on that occasion. But Nurse Mathew testified that it was safe to give him the Dilaudid, and Dr. Carter testified that it was within Mathew's professional judgment to give Creech a higher dose that was within the physician's order, given the short duration of the pain relief Creech had gotten from the previous lower dosage. It was not against the great weight of the evidence for the jury to reject this theory of negligence.

11

Finally, we consider appellants' contention that the nurses breached the standard of care by failing to ensure that Creech wore his oxygen cannula whenever he was not up and walking around. This contention is clearly without merit as to Nurse Conner. Appellants point to no evidence that Nurse Conner was ever aware that Creech was not using his nasal cannula when he was in bed, and she testified that he was wearing it when she saw him around midnight on the night of October 20. Nurse Mathew presents a closer case, because she testified that she never saw Creech wearing his nasal cannula the night of October 20 and she did not tell him to put it back on. Her apparent failure to make sure the cannula was replaced would seem to violate Dr. Shirvani's order, under which he expected Creech to be "covered on that oxygen" as long as he was at the hospital and was not walking around. Expert witness Dr. Seifert testified that the order should have been followed and Creech should have been on oxygen by nasal cannula the entire time of his hospitalization. The critical fact question, however, is whether Nurse Mathew's failure to make sure Creech wore the cannula per Dr. Shirvani's order was something a reasonable nurse would not have done under the same or similar circumstances. She testified that she did not tell Creech to replace the cannula because she did not think he needed it, and she further explained that Creech's breathing and color were good and she saw no distress or shortness of breath. Moreover, Nurse Conner testified, "When he [Creech] needed it on, he did have it on." Mathew's and Conner's testimony is some evidence that Mathews did not breach the standard of care by failing to make sure Creech wore his nasal cannula on the night of October 20, even if that failure violated Dr. Shirvani's order. And again we note that Nurse Patterson testified that both Mathew and Conner met the standard of care in this case. We conclude that the jury's rejection of this theory of negligence is not against the great weight of the evidence, even if the evidence may preponderate the other way. *See Kirkpatrick*, 862 S.W.2d

12

at 772 ("We may not reverse merely because we conclude that the evidence preponderates toward an affirmative answer.").

### 4. Conclusion

For the foregoing reasons, we conclude that the jury's findings in favor of appellees were not against the great weight and preponderance of the evidence as to the essential element of breach of the standard of care.

## C. Sufficiency of the evidence as to proximate cause

Moreover, even if the jury's possible refusal to find a breach of the standard of care was against the great weight and preponderance of the evidence, we further conclude that the jury's possible refusal to find proximate cause is not against the great weight and preponderance of the evidence. Appellants argue this issue essentially as a cause-of-death issue. They contend that the overwhelming weight of the evidence supports their theory that Creech died because he stopped breathing due to obstructive sleep apnea, the of Dilaudid he had received prevented him from waking up and resuming breathing, and the resulting oxygen deficiency brought on cardiac arrest and death. Thus, they contend, appellees negligently caused his death by giving him an excessive amount of Dilaudid and by failing to monitor his breathing more closely. Appellees' causation theory is that Creech died of a sudden cardiac event that was unrelated to his receiving Dilaudid.

### 1. Probative value of the defense's expert testimony

We first address appellants' subsidiary issue that all of the expert testimony that Creech's death was a spontaneous cardiac event unrelated to Dilaudid was devoid of probative value. As appellees point out, appellants did not object to the reliability of this testimony, so the arguments available to appellants on appeal are limited. When a reliability challenge to expert testimony requires the court to evaluate the expert's underlying methodology, technique, or foundational

13

data, error must be preserved by objection. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004). Objection is required to give the proponent of the evidence a fair chance to cure any deficit and prevent trial by ambush. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 817 (Tex. 2009). On the other hand, a challenge that expert testimony is conclusory or speculative on its face, and therefore nonprobative, need not be preserved with an objection to its admissibility. *Coastal Transp. Co.*, 136 S.W.3d at 233; *Pollock*, 284 S.W.3d at 816. Moreover, objection is not required to preserve a contention that an expert's opinion "assumed facts contrary to those on the face of the record." *Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 388 (Tex. 2008) (footnote omitted). Thus, we may consider appellants' arguments only to the extent that they raise complaints that the defense experts' testimony was conclusory, speculative, or assumed facts contrary to those on the face of the record.

Appellants focus their complaints on the deposition testimony of Dr. Dolinak that was played for the jury. They contend that his opinion that Creech died of a sudden cardiac event and not from any effects of Dilaudid was based on mistaken factual assumptions and therefore was not probative evidence. They make three specific contentions in this regard: (1) that Dr. Dolinak mistakenly assumed that no Dilaudid was found in Creech's blood, (2) that Dr. Dolinak mistakenly assumed that a nurse checked on Creech at 1:20 a.m. and found him breathing at that time, and (3) that Dr. Dolinak erred by rejecting the theory that the pulseless electrical activity (PEA) observed during the Code indicated death from hypoxia rather than a sudden cardiac death. They contend that all other experts who agreed with Dr. Dolinak's cause-of-death opinion are likewise no evidence because they adopted Dr. Dolinak's opinions as their own.

We review Dr. Dolinak's testimony. Dr. Dolinak based his conclusion that Creech's death was caused by a cardiac event unrelated to drugs on several factors. He said that the "main evidence" to support that conclusion was the "severe amount of heart disease" that Creech had. Specifically, he testified that Creech's heart was unusually large, with a mass of 530 grams as compared to the normal range of 300 to 350 grams.[1] The heart also had a thickened muscular wall of 1.8 centimeters compared to the normal thickness of 1.1 or 1.2 centimeters. These abnormalities were probably caused by Creech's hypertension, and they in turn probably caused a fatal cardiac dysrhythmia. Dr. Dolinak cited obesity as a contributory condition because it can cause hypertension, would have helped cause Creech's heart disease, and generally places more stress on the body. He acknowledged that one factor that led him to believe that Creech's death was not drug-related was the negative drug screen. He also testified that the rapid sequence of Creech's death was consistent with a cardiac event, and then he further explained that he was referring to the fact that Creech was "well one minute and essentially unresponsive or death [sic] in a matter of ten minutes later." But he acknowledged that this sequence of events could also exist in a case of death from an acute hypoxic event, which was appellants' theory of the case.

Appellants' first argument is that Dr. Dolinak's causation opinion is incompetent because he incorrectly assumed there was no Dilaudid found in Creech's blood. The autopsy report recites that the only drug found in Creech's blood screen was atropine, a medication that is used during resuscitation efforts. The full toxicology report from the blood test, however, showed the presence of Dilaudid in the amount of 8.9 nanograms per milliliter. Trial witnesses explained that, pursuant to federal guidelines, the testing laboratory could not report the Dilaudid finding to the medical examiner's office unless it exceeded a certain level, and in this case the finding of

---

[1] Dr. Norton testified that a normal heart could be up to 400 grams.

15

8.9 nanograms per milliliter was below the reportable limit of 20 nanograms per millliter. Dr. Dolinak acknowledged during his testimony that if the drug screen report was wrong and Creech had other drugs in his body besides atropine, then part of the information on which he based his opinion could be incorrect. But he also testified that, according to the toxicology screen, either no Dilaudid was found in Creech's blood, or not enough Dilaudid was found "to make it significant to report."

We reject appellants' argument that the evidence about the toxicology screen makes Dr. Dolinak's testimony incompetent. His testimony suggests that he was aware that the negative toxicology report meant that other drugs could have been present but below reportable limits, like Dilaudid was. In that case, there was no discrepancy between the facts he assumed and the facts supported by the evidence. Moreover, although Dr. Dolinak acknowledged that the drug report that he relied upon could be wrong, and thus that part of the information on which he based his opinion could be incorrect, he did not elaborate on what kind of error would be necessary or sufficient for him to change his opinion regarding the cause of Creech's death. Other evidence indicates that Dr. Dolinak would not have needed to change his opinion even if he had been informed of the precise level of Dilaudid found in Creech's blood. Another expert testified that by 1:30 a.m., the Dilaudid in Creech's system would have reached "functionally insignificant" levels. Additionally, Dr. Shepherd, a toxicology expert, acknowledged the toxicology finding of 8.9 nanograms of Dilaudid per milliliter of blood and still opined that Dilaudid was not the proximate cause of Creech's death. In summary, there was evidence that Dr. Dolinak was aware of the correct facts—that the negative drug screen meant that Dilaudid was either absent from Creech's blood or present in levels not significant enough to report— when he rendered his opinion. And even if Dr. Dolinak assumed that Dilaudid was completely

16

absent from Creech's blood, there was some evidence that the amount of Dilaudid present was "functionally insignificant," which is compatible with Dr. Dolinak's assumption. For these reasons, we reject appellants' contention that Dr. Dolinak's opinion is incompetent because of an improper factual assumption about the level of Dilaudid in Creech's blood.

Next, appellants contend that Dr. Dolinak's opinion is incompetent because he incorrectly assumed that Creech was observed alive and breathing ten minutes before he was found unresponsive at 1:30 a.m. They base this contention on the following exchange during the deposition testimony played at trial:

> Q. What were the circumstances of [Creech's] death that led you to believe, among other things, that he died of the cardiac event as opposed to a hypox—well, of the cardiac event in addition to the hypoxic event[?]
>
> [Objection to form made but not ruled upon at trial.]
>
> A. The rapid sequence of his demise is typical of a—a heart attack or a cardiac event.
>
> Q. Okay. When you say the rapid sequence of his demise, what do you mean?
>
> A. Being well one minute and essentially unresponsive or death [sic] in a matter of ten minutes later.
>
> Q. That certainly can exist with regard to a person who does die of a—an acute hypoxic event. True?
>
> A. That could be.

Other evidence at trial tended to show that a hospital employee reported to the medical examiner's office that a nurse saw Creech in bed and breathing at 1:20 a.m. and then found him unresponsive about ten minutes later. This report could have been the basis for the ten-minute time span mentioned by Dr. Dolinak in his testimony. At trial, however, no nurse testified to seeing Creech at 1:20 a.m.; Nurse Mathew and Nurse Conner testified that they saw him at

17

midnight, and Nurse Betty Lloyd testified that she saw him walking around and asking for something to drink roughly between midnight and 12:30 a.m.

We reject appellants' argument. Weaknesses in the facts underlying an expert's opinion generally go to the testimony's weight rather than its admissibility, and an opinion is no evidence only if it is based completely on speculation and surmise. *Keo v. Vu*, 76 S.W.3d 725, 734 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). There was some evidence, in the form of the report to the medical examiner's office, to support Dr. Dolinak's apparent assumption that a nurse saw Creech in bed and breathing at 1:20 a.m. Although that evidence was arguably weak and appears to have been uncorroborated by any trial witness, it supports Dr. Dolinak's assumption. Moreover, there was other evidence in the record that Creech's death was relatively sudden. Dr. Shepherd testified that Creech was not cyanotic (was not turning blue) when he was found at 1:30 a.m., which suggested that "the respiratory compromise or dysrhythmic event . . . had not been going on very long when he was found." Nurse Wilson-Cox testified that at the start of the Code, Creech had good color and his body was warm to the touch—facts that suggest that Creech was found soon after he experienced the fatal event. Thus, Dr. Dolinak's assumption that Creech's fatal event was sudden was not based completely on speculation and surmise, and the assumption does not make his causation opinion incompetent speculation.

Finally, appellants contend that Dr. Dolinak's causation opinion is no evidence because he erroneously rejected the theory that the pulseless electrical activity observed during Creech's Code effectively excluded cardiac arrhythmia and sudden cardiac death as the cause of Creech's death. Evidence at trial showed that Creech's heart demonstrated pulseless electrical activity, or PEA, and did not demonstrate ventricular fibrillation during the Code. Appellants' expert pathologist, Dr. Linda Norton, testified that PEA means the heart has electrical activity present

18

that should cause it to beat, but the heart is too weak to beat because of oxygen deprivation. Because the heart cannot beat, despite the proper electrical activity, there is no pulse. According to Dr. Norton, PEA is not associated with sudden cardiac death. Rather, PEA is characteristic of oxygen deprivation to the heart. The typical rhythms associated with sudden cardiac death are ventricular tachycardia or ventricular fibrillation, not PEA. Dr. Norton further testified that, in her opinion, Creech did not die from a cardiac arrhythmia. Dr. Dolinak, by contrast, testified that that many different cardiac dysrhythmias can be associated with hypoxia, and PEA is simply one of them. He also opined that that he was not convinced, based on his experience, that PEA is a reliable indicator of a hypoxic death. Finally, he testified to his opinion that a person can have the appearance of PEA during resuscitative efforts "and still have a completely cardiac non-respiratory event."

The dispute about the significance of Creech's PEA reading is not really a dispute about Dr. Dolinak's factual assumptions. It is a dispute about medical science: does the appearance of PEA in a patient like Creech rule out sudden cardiac death or not? Dr. Dolinak testified, based on his experience, that PEA does not rule out sudden cardiac death and that it is not reliably associated with hypoxic death. Because appellants did not object to Dr. Dolinak's testimony on the ground that his view of the science of PEA was unreliable, appellees did not have the opportunity to develop a record showing its reliability, and the issue was not fleshed out for the trial judge to consider. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex. 1998) (noting that the objection requirement gives the offering party an opportunity to cure any defect and protects that party from trial by ambush). Accordingly, appellants cannot challenge on appeal Dr. Dolinak's conclusion, based on his experience, that the appearance of PEA did not refute his finding of sudden cardiac death or compel a finding of hypoxic death. We note,

19

moreover, that Dr. Dolinak's opinion was similar to that of Dr. Jenkins, who had already testified that, in his opinion, the appearance of PEA was "an unimportant part of the puzzle" in this case.

We conclude that Dr. Dolinak's cause-of-death testimony was neither conclusory nor speculative. Accordingly, it was some evidence that the jury was entitled to consider in weighing the evidence. Based on this conclusion, we necessarily reject appellants' subsidiary contention that all other defense expert testimony about causation was tainted by those experts' alleged reliance on Dr. Dolinak's opinions.[2]

### 2. Analysis of the sufficiency of the evidence

Having determined that Dr. Dolinak's evidence was competent expert testimony regarding the cause of Creech's death, we further conclude that the jury's refusal to find that appellees' negligence proximately caused Creech's death was not against the great weight and preponderance of the evidence.

Appellants adduced evidence that Creech had sleep apnea, that Dilaudid can depress respiratory function, and that the appearance of PEA can indicate a death from hypoxia or oxygen deprivation. Thus, there was evidence to support appellants' theory that appellees' giving Creech Dilaudid and not monitoring his breathing closely enough was the proximate cause of his death by hypoxia. On the other hand, there was also evidence tending to show that Creech's death was probably the result of a sudden cardiac arrest unrelated to his receiving Dilaudid or to a specific episode of sleep apnea the night he died. Dr. Dolinak testified that Creech probably died from a cardiac arrhythmia and that his death was probably unrelated to Dilaudid. He explained the anatomical findings about Creech's heart that supported his

---

[2] We do not necessarily agree with appellants' contention that all other defense experts simply "adopted" Dr. Dolinak's causation opinions as their own. But, having concluded that Dr. Dolinak's causation opinions were not incompetent, we need not explore appellants' contention about the other experts further.

conclusions. Dr. Jenkins testified that there was "absolutely no possibility" that Creech died from a combination of Dilaudid and sleep apnea. He also opined that the appearance of PEA was an unimportant part of the puzzle, and that Dilaudid did not contribute to Creech's death. Dr. Shepherd also testified that he did not believe Dilaudid was the proximate cause of Creech's death. There was evidence that Creech was not cyanotic when he was found unresponsive, which Dr. Shepherd testified was an indication that the cause of Creech's death had not been going on for a long time when he was found.

Like many medical-malpractice cases, this case was in many respects a "battle of the experts." *See Morrell v. Finke*, 184 S.W.3d 257, 282 (Tex. App.—Fort Worth 2005, pet. denied) (en banc). "It is particularly within the jury's province to weigh opinion evidence and the judgment of experts." *Kirkpatrick*, 862 S.W.2d at 772. The jury decides which expert witnesses to credit. *Id*. In this case, the jury heard conflicting opinions and was not persuaded by appellants' experts. We conclude that reasonable minds could differ as to the conclusions and inferences to be drawn from the evidence, so we may not substitute our judgment for that of the jury. *See Wagner*, 229 S.W.3d at 874.

The jury's findings in favor of appellees were not against the great weight and preponderance of the evidence as to the essential element of proximate cause.

### III. DISPOSITION

Having rejected both of appellants' issues on appeal, we affirm the judgment of the trial court.

/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE

101545F.P05

21



# Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

WENDY CREECH, INDIVIDUALLY, AS ADMINISTRATOR OF THE ESTATE OF DONALD CREECH, JR., DECEASED, AND AS NEXT FRIEND OF BILLIE CREECH, A MINOR, JERIMIAH CREECH, DONALD CREECH, AND JANET GIFFORD, Appellants

No. 05-10-01545-CV     V.

COLUMBIA MEDICAL CENTER OF LAS COLINAS SUBSIDIARY, L.P. D/B/A LAS COLINAS MEDICAL CENTER, ANTONETTE CONNER. AND ANNA MATHEW, Appellees

On Appeal from the 160th Judicial District Court, Dallas County, Texas
Trial Court Cause No. 02-05307-K.
Opinion delivered by Justice FitzGerald. Justices O'Neill and Lang-Miers participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees Columbia Medical Center of Las Colinas Subsidiary, L.P. d/b/a Las Colinas Medical Center, Antonette Conner, and Anna Mathew recover their costs of this appeal from appellants Wendy Creech, Individually, as Administrator of the Estate of Donald Creech, Jr., Deceased, and as Next Friend of Billie Creech, a Minor, Jerimiah Creech, Donald Creech, and Janet Gifford.

Judgment entered February 13, 2013.

/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE