**Opinion issued October 6, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-15-00354-CV

_____

### HARRIS COUNTY AND TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, Appellants

### V.

### INTERNATIONAL PAPER COMPANY, Appellee

On Appeal from the 295th District Court
Harris County, Texas
Trial Court Case No. 2011-76724

## MEMORANDUM OPINION

International Paper Company, through its predecessor Champion Paper, operated a papermill in the 1960s. Its paper production process generated waste, known as sludge, which it contracted with McGinnes Industrial Maintenance

Corporation, through its predecessor Ole Peterson, to have removed from its papermill site and permanently deposited in "pits" alongside a Harris County river.

Several decades later, Harris County and the Texas Commission on Environmental Quality brought an environmental-civil-penalty suit against International Paper and McGinnes over the release of dioxin from the long-existing sludge pits, seeking $1.591 billion in daily-accruing penalties from each defendant under later-enacted environmental statutes, plus almost $10 million in attorney's fees. At the conclusion of the lengthy trial, but before the case was submitted to the jury, McGinnes settled. International Paper was the only remaining defendant. The jury found no liability, and the trial court rendered a take-nothing judgment in International Paper's favor.

The County and TCEQ[1] contend that the trial court committed three errors in the court's charge: (1) limiting the County's Solid Waste Disposal Act claim to only one of three bases for liability—a discharge—after refusing the County's liability question that included all three bases—a discharge, a nuisance, and an endangerment; (2) instructing the jury that International Paper did not own the sludge after 1966, which was the year McGinnes completed the project to permanently place the sludge in the pits; and (3)  instructing the jury that generating

---

[1] The TCEQ is a necessary and indispensable party to this litigation, TEX. WATER CODE ANN. § 7.353, and also appeals the defense verdict. Its appellate issues mirror those of the County. For simplicity, we will refer to both appellants as "the County."

2

waste and contracting for its disposal are not, alone, sufficient to establish that International Paper is liable for a discharge. The County and TCEQ contend that the trial court committed a fourth error by excluding expert testimony and scientific literature evidence labeling dioxin as a carcinogen, based on an improper interpretation of expert testimony requirements.

International Paper responds that the trial court did not err in any of these respects and, to the extent there is any error, it is harmless. International Paper also raises a cross-point, asserting that, even if the trial court erred, remand would be unnecessary because it was entitled to judgment as a matter of law on its laches affirmative defense and the trial court erred by denying its directed-verdict motion on that defense.

We affirm.

## Background

There are five dates or date ranges that are significant in this litigation. We will give first an overview of their importance and then discuss each in more detail. Next, we will provide an overview of the parties' trial theories and discuss the key rulings made by the trial court related to experts and the jury charge.

### A. Significant historical dates

The first important time period is from 1965 to 1966, when International Paper, through its predecessor Champion Paper (collectively, "IP"), contracted with

McGinnes, through its predecessor Ole Peterson, (collectively, "MIMC") to permanently dispose of papermill byproduct "sludge" in pits along the San Jacinto River, with the belief that the sludge would quickly harden and the clay in the soil would prevent any migration of the sludge into the river. The pits were dug in 1965 and were full by 1966, when MIMC "abandoned" them.

The second important date is 1973, when an aerial photograph was taken of the sludge pit site. The photograph shows that the levee surrounding the sludge pits no longer divided the pits from the river. Therefore, the surface of the sludge pits was in contact with the flowing river at that date.

The third important period is the mid-1980s, when scientists discovered that papermill sludge contains dioxin, which is an organic material that, while "ubiquitous" in our environment, "may be harmful to the public health or the environment."[2] According to an IP expert, dioxin is one of the "most hydrophobic chemicals," which means that it tends to adhere to organic materials and "doesn't want to leave that to go in the water." But water can transport dioxin by "mobiliz[ing] or mov[ing] particles which dioxin is attached to." The Environmental Protection Agency labeled dioxin a "dangerous substance" in 1985.

---

[2] There is no evidence that any party to this litigation knew in the 1960s that paper mill sludge contained dioxin.

The fourth important period is the 2000s, when third parties engaged in significant commercial dredging in the San Jacinto River near the sludge pits. The dredging was authorized by dredging permits issued by the U.S. Army Corps of Engineers. There is evidence that the commercial dredgers operated too close to the shoreline and dredged away a portion of one of the pits. It is undisputed that the dredging caused the release of dioxin into the river.

The fifth significant date is 2008, when the EPA designated this area of the San Jacinto River a Superfund site subject to federally mandated cleanup due to the presence of dioxin.

### 1. 1965 to 1966

In the early 1960s, there were no environmental regulations concerning how paper companies disposed of their waste products. It was common practice to allow liquid waste to discharge into streams and flow into the Gulf and to bury solid and mixed "sludge" waste on the producer's land or, if there was limited space, at off-site dumping grounds.

IP operated a papermill in Pasadena in the 1960s and was searching for an off-site location to dispose of accumulated papermill sludge byproduct. This sludge was over 90 percent water but also contains "long wood tree ligament fibers that . . . intertwine to form a mat." According to a 1966 State Department of Health report, sludge would "solidify rapidly" after setting for "a short time," so that "water will

not penetrate it—that is rain water will stand over it." Robert Zoch, a chemical engineer and one of IP's experts, testified that, once papermill sludge hardens, "water won't seep into it . . . . The material actually has a very low permeability approaching that of clay." The sludge material becomes so hard that a "high pressure water jet" is required to remove the material from surfaces.

IP conducted a survey comparing the costs and benefits "of the possible ways by which sludge collected in [its on-site] settling basins might be disposed of permanently."

In 1965, IP hired MIMC to transport sludge from its Pasadena papermill. The disposal agreement between IP and MIMC provided that MIMC would "remove" the "waste sludge" and dispose of it on land that MIMC would purchase at its own expense. MIMC was required to give IP "advance notice of the nature of [the removal] equipment and the proposed route of such equipment" within IP's facility. The agreement required MIMC "to procure at its own expense a tract of land acceptable to [IP] to be used by [MIMC] for depositing such sludge and to transport such sludge by barge from [IP's] facilities to said tract of land." MIMC was hired "as an independent contractor" with "full rights and authority to determine the means and methods of carrying out the work." The contract stated that "[t]he sludge to be removed by [MIMC] is not considered by the parties to be inherently harmful or dangerous but it is recognized that any spillage of the sludge would create an untidy

6

condition and impede the use of the road or ground upon which such spillage occurred." MIMC was also required to "secure and keep in effect all permits and licenses required in connection with the performance of the work" and "comply with all governmental laws, rules and regulations."

MIMC purchased a 20-acre area of land on the bank of the San Jacinto River and constructed pits to contain the sludge. The parties dispute whether MIMC or Virgil McGinnes (an MIMC officer) owned the land where the pits were located. After the conclusion of the evidence, the trial court granted IP's motion for directed verdict on the issue of ownership of the waste, concluding that Virgil McGinnes owned the land because his name was listed on the deed, though in a "trustee" capacity.

The County's expert environmental engineer, John Pardue, testified that IP did not own the property or transport the waste. Instead, it hired MIMC to dispose of the waste "permanently" at the agreed location. Zoch, a chemical-engineer expert witness retained by IP, testified that, in the 1960s, the producer of such sludge did not have any legal or industry-imposed duty to conduct ongoing maintenance after the waste was transported off the producer's property. IP had no involvement with the sludge pits after MIMC filled them.

During the 1960s, no permits were required for the disposal of industrial sludge nor did the State or County issue disposal permits. Zoch testified that "most

plants had an area . . . in the back of the plant where they could just bury [solid waste or sludge] on the site." According to Zoch, in the 1960s, it was "unusual" for a company like IP to go "above and beyond normal practice at that time" and seek approval for its waste disposal plans. Nonetheless, IP conferred with the County's officials as it developed its disposal plan. Zoch testified that the County "assisted in the design and then the approval of the proposed operations." One of the County's experts, Pardue, who examined the site and the history of the waste disposal, conceded that the County "was aware of the process that was going to be used to dispose of waste in these impoundments" and "approved the process."

The County's Director of Air and Water Pollution Control was involved in the design of the pits, approved their location, and physically inspected them as they were constructed. In a Texas Water Pollution Control board meeting, the Director stated that he "was originally involved with the original contractor in helping to design the present pits." The original contractor's notes from a telephone conversation with the Director stated that the Director "indicated an awareness of our potential contracting to dispose of sludge from the settling basins," acknowledged that he "inspected" the equipment, "ventured an opinion that this equipment was the best he had seen," and as a result, "approved" the contractor's method of developing the pits.

8

The Director wrote two letters discussing his approval of the disposal plan. In the first letter, written in May 1965, the Director stated that the "location of the proposed spoil pond . . . seems to be ideal for the purpose for which you intend to use it" because the soil along the river is "composed of clay, which should render it practically impossible for seepage to escape and enter into the San Jacinto River." This letter, according to Robert Allen, the current Director, is the closest that IP could get to a permit under Texas law at that time.

The same letter discusses IP's duty to ensure that the "waste handling operation should be done in a manner which would not allow any liquid waste to leave the property and escape into the river." IP asserts that this provision only applied to the transportation of the waste. Its expert, Zoch, testified that the County was concerned about "liquid waste during the operation leaving the site" and the County was telling IP "that while you are out there doing this waste disposal at this site . . . you got to make sure that that operation doesn't allow liquid waste, contaminated material, contaminated liquids to leave the property." Consistent with the Director's statement that seepage would be "practically impossible" because of the clay in the soil, MIMC did not separately line or cover the pits it constructed.

The Director wrote a second letter several months later that was addressed to MIMC and discussed transportation of waste to the pits. It states that the County gave its "approval" to the pits "only under the condition that the waste handling

9

operation should be done in a manner which would not allow liquid waste to leave the property and escape into the river." The letter set a 24-hour deadline for MIMC to repair the dikes used to contain the waste.

Between 1965 and 1966, MIMC dumped between 125,000 and 130,000 cubic yards of sludge into the pits alongside the San Jacinto River. The pits became "full" in 1966, and the disposal activities ended. In 1968, MIMC determined that the land had become "worthless in that it had no present sales value," and, as a result, its stated book value was reduced from "the cost of $50,000 to the nominal sum of $1." The County's expert, Pardue, testified that, after the waste was deposited, MIMC "abandoned" the land and conducted "no further maintenance activities" after 1966.

## 2. 1973

The structure of the pits and the contours of the river as it flowed past them changed after the land was abandoned. An aerial photograph taken in 1973 shows that the river intruded into the pits. There was no evidence of water or soil testing from the 1970s to determine if dioxin was released into the water as it washed over the pits. Nonetheless, the County presented expert testimony that dioxin was released into the water at least by 1973 because of the water intrusion. IP presented expert testimony disputing that contention, arguing that the properties of dioxin prevent it from simply "washing away" with the tide.

10

### 3. 1980s

In 1985, the EPA labeled dioxin as a "dangerous substance" that "may be harmful to the public health or the environment." In the late-1980s the EPA took part in two studies of papermills—the "Five Mill Study" and the "104 Mill Study"—that revealed the presence of dioxin in papermill sludge. One of the mills analyzed in the studies was an IP papermill. Those findings led to changes in paper production processes to eliminate dioxin.

### 4. Early 2000s

In the early 2000s, commercial dredging began in the river near the sludge pits. The dredging was performed under U.S. Army Corps of Engineers permits. Before such dredging could begin, the public had to be informed and certain agencies had to approve the operations. Despite its involvement with the selection of this location for the pits and its notice of proposed dredging activity, the County did not object to issuance of dredging permits for this area of the river.

Aerial photographs taken after dredging began reveal "inundation areas along the edge of the river," with much of the pits "completely and totally submerged." The original site was 20 acres; 15 or 16 of those were submerged and had river water flowing over them. These photographs show significantly more water flowing over the pits in the 2000s than was seen in the 1973 photograph.

Testing near the site in 2005 revealed high amounts of dioxin in the area with lower levels upstream and downstream from the site. The sludge itself was also tested. According to Mark Johns, an IP expert, the sludge continued to demonstrate its earlier properties, meaning that it still had low permeability, similar to "typical liners used in hazardous waste landfills currently," and would not "dissolve away when it came into contact with water."

### 5. 2008

In 2008, the EPA designated the pits as a "Superfund" site, which means that the area became a national priority for environmental remediation because of known or threatened releases of hazardous substances at the site. *See Int'l Paper Co. v. Harris Cty.*, 445 S.W.3d 379, 395 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citing 42 U.S.C. §§ 9601–9626).

## B. The parties' theories at trial

The County sued IP and MIMC[3] and sought daily civil penalties for violations of various statutes, none of which were in existence at the time of the waste disposal. The first of those statutes is the Solid Waste Disposal Act, which states as follows:

> [N]o person may cause, suffer, allow, or permit the collection, handling, storage, processing, or disposal of industrial solid waste or municipal hazardous waste in such a manner so as to cause (1) the discharge or

---

[3] The County also sued Waste Management, which had acquired all of MIMC's shares in 2003. Waste Management settled at the same time MIMC settled, just before final arguments.

imminent threat of discharge of industrial solid waste or municipal hazardous waste into or adjacent to the waters in the state without [necessary authorization]; (2) the creation and maintenance of a nuisance; or (3) the endangerment of the public health and welfare.

30 TEX. ADMIN. CODE § 335.4. The date range during which IP could be assessed penalties for alleged violations of the SWDA was from 1975[4] to 2008.[5]

The second statute is Water Code section 26.121, which prohibits the "discharge" of "industrial waste into or adjacent to any water in the state." TEX. WATER CODE ANN. § 26.121(a)(1). It also states that "[n]o person may cause, suffer, allow, or permit the discharge of any waste or the performance of any activity in violation of this chapter . . . ." *Id.* § 26.121(c). The date range during which IP could be assessed penalties for violations of this Water Code provision was from 1973[6] to 2008.[7] The trial court instructed that the penalties that could be imposed under these two statutes[8] were daily penalties and the amount that could be imposed changed over time, ranging from a low of $50 to a high of $25,000 per day of violation.

---

[4]     The 1975 date corresponds to the effective date of the Solid Waste Disposal Act.

[5]     The 2008 date is when the EPA Superfund clean-up efforts began.

[6]     An aerial photograph dated February 1973 shows a breach in the levee and water in contact with the pits. There was no evidence of a breach before 1973; therefore, 1973 was designated as the beginning penalty-period date for this statute.

[7]     *See supra*, note 5.

[8]     The County pleaded violations of the Spill Act as well, but that theory was not included in the jury charge. *See* TEX. WATER CODE ANN. § 26.266. No party alleges error in its omission.

13

The parties do not dispute that at least some of the dioxin found in the river came from the pits. All parties agree that the dredging activities in the early 2000s cut into the sludge pits and removed sludge, thereby releasing some dioxin into the river. But the County contends that dioxin was released into the river even earlier when water first washed across the top of the sludge pits and that the release continued, thereafter, every day for decades. The County, therefore, argued for daily penalties from the earliest documented date of water inundation (1973, according to the aerial photograph admitted into evidence) to the date the EPA designated the area as a Superfund site (2008).

Pardue, the County's expert environmental engineer, testified that aerial photos showed that "dioxin did leave the impoundments starting in 1973 and going to the end of the penalty period on a daily basis." He stated that there had been "a break in the levee that allowed the water to get in" and, as a result, "the whole impoundment was completely submerged." He testified that the flow of tidal water over the pits released dioxin into the river.

IP's expert, Zoch, testified that "the cause of the dioxin released from the pits is the sand dredging." A second IP expert, Johns, explained that "the dredging actually dug into the dikes in the northwest corner and into the waste material." Johns testified that no data supported the County's theory that the dioxin release was due to water inundation or that dioxin was being released every day during the assigned

14

penalty period. According to Johns, the sludge could not have been carried away by mere contact with water because "water is not able to penetrate it very easily from the outside."

IP proffered, in support of its theory that it was the dredging that released the dioxin and not water inundation, a 2005 email from a Texas Parks and Wildlife employee, which stated, "In looking over the more recent data I believe more firmly that the recent sand mining was responsible for the increase in dioxin levels at the site noted between 1994 and 2002."

Johns also testified that not all of the dioxin in the area came from the pits. At least some of the dioxin "fingerprints" in the river did not match the dioxin in the pits. A County expert, Pardue, agreed that there are other sources of "ubiquitous" dioxin in the area, including automobile exhaust from cars traveling on the I-10 bridge over the river and factories along the river.

## C. Expert testimony and the parties' stipulation

Before trial and over the County's objections, the trial court excluded evidence, including some expert testimony, governmental reports, and other literature, indicating that dioxin is a carcinogen that presents health risks.

Before opening statements, the trial court instructed the jury that the parties had stipulated to certain matters that were "not going to be litigated in this case" and

that were "not going to be in dispute . . . ." The following was part of the stipulation read by the trial court to the jury:

> In July 1985, the EPA listed dioxin as a hazardous substance. As a result of its determination that dioxin may be harmful to the public health or the environment, the EPA listed the site as a Superfund site in 2008, due to the presence of dioxin. The fact that the EPA designated the site as a Superfund site is not a factor for you to consider in this case in determining whether any Texas statute has been violated.

## D. Trial court's instruction on ownership

At the close of the evidence, the trial court granted IP's motion for directed verdict on the issue of waste ownership, holding that IP "did not own the waste after the waste was placed at the San Jacinto Site." Over the County's objection, the trial court included a jury instruction with both the SWDA- and Water Code-based liability questions that "as of 1966, [IP] no longer owned the waste and no longer had a contract for disposal at the Site." It also instructed the jury that IP's relationship with MIMC ended in 1973 and that "the mere fact that [IP] generated the waste and contracted with an independent waste disposal company for its disposal is not, by itself, sufficient to establish that [IP] is liable for any discharge."

## E. Trial court's refusal of the County's proposed liability question and definition of nuisance

At the charge conference, the County requested an SWDA-based liability question that included nuisance and endangerment as bases for liability. *See* 30 TEX. ADMIN. CODE § 335.4 (including three categories of SWDA violations: (1) discharge

16

or imminent threat of discharge; (2) creation and maintenance of nuisance; and (3) endangerment of public health and welfare). The court submitted two liability questions—Jury Questions One and Four. In Question One, which was based on the Water Code, the jury was asked whether IP "caused, suffered, allowed, or permitted the *discharge* of industrial waste containing dioxin into or adjacent to any water in the State . . . ." (Emphasis added.)

In Question Four, which was based on the SWDA, the jury was asked whether IP "caused, suffered, allowed, or permitted the *handling or disposal* of industrial solid waste containing dioxin in such a manner so as to cause the discharge or imminent threat of discharge of industrial solid waste containing dioxin into or adjacent to the water in the State . . . ." (Emphasis added.)

The trial court included a definition of "cause, suffer, allow or permit" that informed the jury that a person "'causes, suffers, allows, or permits' an event when that person had the power to prevent an event at the time of the event, but failed to do so."

## F.     Defense verdict

After a 16-day trial, consisting of 14 witnesses and 365 exhibits totaling over 4,200 pages, the jury answered the liability questions against IP "no," and the trial court entered a take-nothing judgment. The County appeals.

## Charge Error
## Jury Question Refused

In its first issue, the County contends that the trial court erred when it did not include nuisance or public endangerment in the SWDA-based liability question.

IP argues that the trial court did not abuse its discretion by refusing to submit nuisance and public endangerment because (1) the theory of SWDA-based liability pleaded by the County was premised on a discharge of dioxin into the river, (2) the only evidence the County offered at trial to support its theory that IP had violated the SWDA was evidence of a daily discharge of dioxin into the river, and thus, (3) any liability for nuisance or endangerment was subsumed within the broad form definitions of liability that were submitted to the jury and which the jury rejected.

### A.  Standard of review

The trial court "shall submit the questions, instructions and definitions . . . raised by the written pleadings and the evidence." TEX. R. CIV. P. 278. "Whether the charge submits the controlling issue in the case, in terms of theories of recovery or defense, is a question of law which is reviewed de novo." *Hamid v. Lexus*, 369 S.W.3d 291, 295 (Tex. App.—Houston [1st Dist.] 2011, no pet.). A legal-sufficiency standard applies: if there is more than a scintilla of evidence to support a finding in favor of the party that pleaded the issue, it is error to refuse the submission. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992); *Roy v. Howard-Glendale Funeral Home*, 820 S.W.2d 844, 846 (Tex. App.—Houston [1st Dist.] 1991, writ denied).

18

"Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence." *P.V.F., Inc. v. Pro Metals, Inc.*, 60 S.W.3d 320, 323 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

Failure to submit an issue cannot be a ground for reversal unless the party with the burden of proof has requested the issue in "substantially correct wording." TEX. R. CIV. P. 278; *Perez v. Weingarten Realty Inv'rs*, 881 S.W.2d 490, 493 (Tex. App.—San Antonio 1994, writ denied). A request is not substantially correct if it is too vague or contains a term that requires a definition but the party fails to tender the definition. *Perez*, 881 S.W.2d at 493; *see Select Ins. Co. v. Boucher*, 561 S.W.2d 474, 479 (Tex. 1978).

If the charge is legally correct, the trial court has broad discretion regarding how to submit the issues, including the wording of questions, definitions, and instructions. *Cont'l Cas. Co. v. Baker*, 355 S.W.3d 375, 382 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Thus, an appellate court reviews allegations of charge error under an abuse-of-discretion standard. *Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 703 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Howell Crude Oil Co. v. Donna Refinery Partners*, 928 S.W.2d 100, 110 (Tex. App.—Houston [14th Dist.] 1996, writ denied). Under the abuse-of-discretion standard, we may not substitute our judgment for the trial court's and, instead, decide only whether the

trial court's action was arbitrary or unreasonable. *European Crossroads' Shopping Ctr., Ltd. v. Criswell*, 910 S.W.2d 45, 54 (Tex. App.—Dallas 1995, writ denied).

Charge error requires reversal when it "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a)(1). When determining whether charge error probably caused an improper judgment, we examine the entire record. *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 225 (Tex. 2010). "Charge error is generally considered harmful if it relates to a contested, critical issue." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009). An omitted jury question is immaterial, and cannot be said to have probably caused the rendition of an improper judgment, if its answer can be found elsewhere in the jury's answers to submitted questions or when its answer would not affect the outcome of the verdict. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995); *MEMC Pasadena, Inc. v. Riddle Power, LLC*, 472 S.W.3d 379, 393–94 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Hilsher v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 717 S.W.2d 435, 439 (Tex. App.—Houston [14th Dist.] 1986, no writ).

Finally, in preparing a jury charge, "[t]he goal is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely." *Cal Dive Offshore Contractors Inc. v. Bryant*, 478 S.W.3d 914, 920 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *see Hyundai Motor Co. v. Rodriguez*, 995

S.W.2d 661, 664 (Tex. 1999). There is no indication in the record of the trial court's reason for refusing the County's requested jury question. That refusal will not be an abuse of discretion if the questions submitted fairly place the disputed issues before the jury, considering the pleadings, the evidence, and the charge in its entirety. *See Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 653 (Tex. App.—Dallas 2002, pet. denied); *cf. Luxenberg v. Marshall*, 835 S.W.2d 136, 142 (Tex. App.—Dallas 1992, orig. proceeding) ("A trial court cannot abuse its discretion if it reaches the right result, even for the wrong reasons.").

## B. The County's requested jury question compared with the questions and instructions in the court's charge

At the charge conference, the County requested an SWDA-based liability question that asked whether IP caused or allowed[9] the "handling or disposal" of waste in such a manner so as to cause a discharge or imminent threat of discharge, a nuisance, or a public endangerment at any time from December 31, 1975, until March 30, 2008. *See* 30 TEX. ADMIN. CODE § 335.4. Along with its proposed liability question, the County submitted a proposed instruction that would have instructed the jury that "nuisance" means "a condition that substantially interferes with the use and

---

[9] The question included the entire list of active and passive verbs from the statute but, because the inclusion of these terms or exclusion of other terms is not being challenged by any party, for simplicity and to maintain focus on the alleged error, we will refer to the list of "caused, suffered, allowed, or permitted" as "caused or allowed."

21

enjoyment of property by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities." This is the established and accepted definition of a "private nuisance." *See Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, No. 15–0049, 2016 WL 3483165, at *6 (Tex. June 24, 2016); *Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003). The County did not submit a proposed definition of "endangerment." The trial court refused the County's proposed liability question and its proposed private-nuisance definition without explanation.

In the liability question the trial court included in its charge, it asked the jury whether IP caused or allowed the "handling or disposal" of waste in such a manner so as to cause the "discharge or imminent threat of discharge" of waste containing dioxin into or adjacent to the water in the State at any time during the agreed date range.

## C. The County's pleadings supported the submission of a discharge-based theory of liability

SWDA liability can be premised on a variety of actions related to waste, including the "collection, handling, storage, processing, or disposal" of waste. 30 TEX. ADMIN. CODE § 335.4. If a defendant causes or allows any of those actions *and* a discharge, nuisance, or public endangerment results, civil penalties may be imposed. *See id.*

The County's third amended petition—its live pleading at the time of trial—asserts that "[t]he citizens of Harris County can no longer enjoy camping, picnicking

22

or eating fish or blue crabs in the San Jacinto River free from fear." According to the County, "[t]he harm to Harris County and its residents" was caused by IP's "actions and inactions . . . in causing, allowing and permitting the release of dioxin waste . . . and the conscious and intentional abandonment of the waste and pollutants into the environment and food chain being consumed by the people of Harris County." The defendants, the County argued, "left a legacy of pollution in Harris County by causing and allowing dioxin to be released into the San Jacinto River . . . ." These statements culminated in the assertion that, "[i]n essence, these entities 'caused, suffered, allowed and permitted' the waste to be released into the waters of the State on a daily basis." Throughout its pleading, the County focused on its assertion of a daily discharge of dioxin into the river over several decades and the resulting environmental harms.

Although the petition focuses on the alleged discharge of dioxin into the river and the negative impact that discharge had on the safety of the water for public recreation and as a food source, the County pleaded its cause of action more broadly to assert that IP violated the statute by allowing "the storage and discharge" of waste, not just a discharge. Thus, we address whether the inclusion of the term "storage" supports the County's argument that it was entitled to the question it proposed rather than the one the court submitted. We conclude that it does not for two reasons.

First, the liability question the County requested would not have permitted the jury to find liability based on a "storage" theory. The term "storage" was not in the County's proposed question. Instead, its proposed question conditioned a liability finding on  the "handling" or "disposal" of waste. The difference is significant because the SWDA provides different definitions for each of these actions. *Id.* § 335.1(47) (disposal); § 335.1(152) (storage).

Second, the claim the County pleaded—a "storage" causing a nuisance or endangerment—was not supported by the evidence under the statutory definition of the term. In the SWDA, "storage" means "[t]he holding of solid waste for a temporary period, at the end of which the waste is processed, disposed of, recycled, or stored elsewhere." *Id.* § 335.1(152). Yet the County consistently argued that IP contracted to have sludge "permanently" disposed of next to the San Jacinto River, MIMC "abandoned" the sludge pits, no one maintained the pits over the next forty years, and, by their inaction, both IP and MIMC caused or allowed dioxin to be released into the river as its waters flowed over the engulfed pits decades later. The County presented no evidence that the holding of waste in the pits was temporary. The pleading of a "storage" of sludge next to the river, when the County pleaded that IP allowed the "storage and discharge" of waste, did not support the submission of a liability question broader than that submitted by the trial court, which asked whether IP "caused, suffered, allowed, or permitted" the "handling or disposal" of

waste in a manner so as to cause the discharge or imminent threat of discharge. The liability question proposed by the County restricted the penalty period to the years between 1975 and 2008. But it is undisputed that IP generated and contracted for the waste's disposal before 1975 and had no involvement after that date. Any IP activity in the 1960s that was intended to be temporary would not support liability under a penalty period that did not begin until a decade later.

The county's liability theory against IP was premised on its causing or allowing waste to be discharged, not temporarily stored. *Cf. Kane v. Cameron Int'l Corp.*, 331 S.W.3d 145, 148 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (differentiating between claim actually asserted by plaintiff—physical invasion of property by chemical discharge—and other claim that may have been available but was not argued—reasonable fear of chemical discharge). We conclude that the pleadings and the evidence do not support submission of the County's proposed liability question. The trial court properly charged the jury on the County's theory.

## D. The County's failure to present evidence to support the submission of its proposed nuisance question

The SWDA permits civil penalties against those who cause or allow the "collection, handling, storage, processing, or disposal of industrial solid waste" in such a manner so as to cause the "discharge or imminent threat of discharge" of the waste into or adjacent to the waters in the state without necessary authorization. 30 TEX. ADMIN. CODE § 335.4 The statute contains broad but distinct definitions of

25

"disposal" and "discharge." "Disposal" means the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste . . . (whether containerized or uncontainerized) into or on any land or water so that such solid waste . . . or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters." *Id.* § 335.1(47). Or, more simply, one disposes of waste by placing the waste so that it "may" enter any waters. *See id.* "Discharge," which is a term within the "disposal" definition as well as the first category of adverse events in Section 335.4, means the "accidental or intentional spilling, leaking, pumping, pouring, emitting, emptying, or dumping of waste into or on any land or water." *Id.* § 335.1(46). The trial court tracked these two statutory terms in its jury charge.

Thus, the term "disposal," as used in the statute and in the charge, reaches acts that do not actually result in a discharge or imminent threat of discharge but "may" do so,[10] indicating a possibility that they would do so in the more distant future.[11] Under these definitions, the County could prevail even if it did not prove a discharge, provided the disposal of the sludge into the pits near the river created the risk that it

---

[10]    The definition of "disposal"—both in the statute and in the court's charge—includes the term "discharge." *See* 30 TEX. ADMIN. CODE § 335.4.

[11]    *See* WEBSTER'S NEW WORLD COLLEGE DICTIONARY, 903 (5th ed. 2014) (defining "may" as "used to express possibility or likelihood").

26

might "enter the environment or be discharged into any waters" in the future and there was evidence that this risk created a nuisance.[12]

The County contends, however, that the trial court's instructions did not encompass the theory of nuisance that it proposed with its requested instructions. Therefore, we must address whether there was evidence of a nuisance[13] from having

---

[12]    To the extent that the two definitions of disposal and discharge overlap—because both definitions include a discharge, as well as dumping, spilling, and leaking— when the jury rejected the discharge theory, it necessarily would have had to reject the nuisance theory to the extent that it depended on this same predicate, meaning the placement of waste that caused actual or imminent discharge of waste. Therefore, we limit our inquiry under the disposal-leading-to-a-nuisance-without-a-discharge theory to whether there is evidence that IP caused or allowed the placement of sludge in pits in a manner that caused a risk that sludge might "enter the environment or be discharged into any waters" but did not actually discharge or qualify as an imminent threat of discharge so as to cause a nuisance. *See* 30 TEX. ADMIN. CODE §§ 335.1, 335.4.

[13]    Contrary to its trial position, when it submitted an instruction on a private nuisance, the County now asserts that it was entitled to an issue on public nuisance, defined by the County as "a condition that amounts to an unreasonable interference with a right common to the general public." *See Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, No. 15–0049, 2016 WL 3483165, at *6 (Tex. June 24, 2016); *see id.* at *4 n.3 (stating that "public nuisance generally addresses conduct that interferes with 'common public rights' as opposed to private individual rights"); RESTATEMENT (SECOND) OF TORTS § 821B(1) (1979). This new position is significant for two reasons. First, charge objections and requests for instructions must comport with the arguments made on appeal. *Cont'l Cas. Co. v. Baker*, 355 S.W.3d 375, 383 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Second, abandonment of the private-nuisance theory is a tacit acknowledgement by the County, in our view, that it presented no evidence in support of that theory. The County's new proposed nuisance definition—a public nuisance—is consistent with the County's presentation of its case, which was that the public's use of the San Jacinto River had been interfered with unreasonably because of the discharge of dioxin-containing sludge into the river, but is not consistent with the instruction it requested at trial.

27

dioxin-containing sludge contained next to the river such that it "may enter the environment or be . . . discharged into any waters" in the non-imminent future.[14]

The SWDA is a civil penalty statute that permits the accrual of daily penalties for violations. The County was seeking daily penalties, not compensatory damages. The daily penalties ranged from $50 to $25,000, and the County argued for the maximum. To this end, the County sought to show that IP had engaged in wrongful conduct that caused pollution to the river (i.e., a discharge). The County did not try its case as though pollution might occur; it argued that pollution had occurred every day for forty-plus years, and then argued that this wrongful conduct supported the maximum penalty, over $1.5 billion.

The County presented expert testimony that there was a daily discharge of dioxin into the water. The jury rejected that theory of liability. The County responds that IP's stipulation provided some evidence of a nuisance because it conceded that dioxin is "dangerous." But placement of a dangerous product in a location is not, per se, a violation of the SWDA. More is required to prove a nuisance. The party on

---

[14]     We describe it as "non-imminent future" because a risk of an imminent release would fall within the "discharge" subsection that was submitted to the jury and rejected by it. *See* 30 TEX. ADMIN. CODE §§ 335.1, 335.4 ("[N]o person may cause, suffer, allow, or permit the collection, handling, storage, processing, or disposal of industrial solid waste or municipal hazardous waste in such a manner so as to cause [ ] the discharge *or imminent threat of discharge* of industrial solid waste or municipal hazardous waste into or adjacent to the waters in the state without [necessary authorization] . . . .") (emphasis added).

28

which a penalty is assessed must have caused or allowed the placement so that it may discharge into the water and create a nuisance. *See* 30 TEX. ADMIN. CODE § 335.4 (predicate requirements).

To establish a nuisance, the plaintiff must present evidence that the interference with the use of property is substantial enough to demonstrate more than a theoretical risk of some future harm. Otherwise, any land on which waste is placed would per se constitute a private nuisance because of the theoretical possibility that the waste will leak or escape onto a neighboring property.

Absent an actual, realized interference with another's use of property (i.e., an invasion on the ground or in the water, minerals, or air), there must be an objectively reasonable and well-founded apprehension of danger from the specified risk caused or allowed by the party against whom the nuisance claim is brought. *See Kane*, 331 S.W.3d at 148 (stating that private-nuisance claim can result from sufficiently extreme invasion or "by using property in a way that causes reasonable fear in those who own, lease, or occupy property nearby"); *Maranatha Temple, Inc. v. Enter. Prods. Co.*, 893 S.W.2d 92, 99 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (stating that something that causes "a well-founded apprehension of danger may be a nuisance"); *see also Crosstex*, 2016 WL 3483165, at *8 (holding that unreasonableness of discomfort or annoyance (or fear) "must be determined based on an objective standard of persons of ordinary sensibilities, not on the subjective

response of any particular plaintiff"); *id.* at \*11 (stating that "the standard for determining whether the effects of the interference are unreasonable is an objective one").

The failure to prove an actual discharge cannot substitute for evidence of an unrealized risk of a future discharge due to IP's conduct. *Cf. Kane*, 331 S.W.3d at 148 (affirming summary judgment against plaintiff because plaintiff's nuisance claim was based solely on allegation of physical invasion of plaintiff's property and plaintiff had no evidence of that claim, even though nuisance claims also can be based on other non-invasive acts). A risk of discharge due to IP's conduct cannot be presumed through the failure to prove an actual discharge.

The County points to the inability to dredge the river near the site or to fish the area. Neither of these satisfies the evidentiary requirements for a broader submission than the trial court gave under the facts here. Dredging was not halted until after the penalty period; therefore, the inability to dredge in 2009 and beyond cannot be an actionable nuisance between 1975 and 2008. The jury received no explanation, through expert testimony, other evidence, or argument, of how a risk of a future discharge that was not realized by the end of the penalty period (2008) could rise to the level of a nuisance before 2008.

Fundamentally, the County cannot point to evidence that would not be included in the broad causation instruction (cause, suffer, allow, or permit) and the

30

broad definition of discharge, which included the imminent threat of discharge. To the extent the evidence proffered by the County indicates an inability to fish or otherwise use or enjoy the river, it is because dioxin was discharged into the environment. That theory is based on a discharge. The County points to no other evidence of a non-discharge-based nuisance.

The evidence the County presented matched its case theory, summarized in the County's opening statements:

> [I]t is [the] defendants' position that they should pay not one dollar for one day of violation of any of the statutes . . . because none of the dioxin got out of these impoundments. . . . It's Harris County's position that every day after February 15th of 1973, paper mill sludge containing dioxin was released into the San Jacinto River . . . and that there has been 35 years of violations of the Texas environmental statutes and for that, these defendants should pay civil fines and penalties. So that's the thumbnail sketch of our case.

The theory remained the same during closing argument:

> This is . . . about a company that did not follow its obligations under the law and, as a result, it should pay a penalty, as required by the law. The law says that, if you cause, suffer, [or] allow pollution of the waters of our state, you should pay a penalty.

We conclude that the County was not entitled to a broader jury question on whether IP caused or allowed a disposal of waste in a manner that caused a nuisance than the one that the trial court submitted.

**E. Outcome on refused public-endangerment question tied to that of nuisance and discharge questions**

The County argues that the public-endangerment and nuisance issues are "independent of one another." Thus, according to the County, even if the trial court did not err in refusing to submit the nuisance question, it erred in not submitting an endangerment question. We disagree.

The County submitted these "independent" theories in a single proposed jury question; therefore, the opposite is true: if the trial court did not abuse its discretion in the refusal of one part of a singularly submitted liability question, then there is no abuse of discretion in the refusal of the entire question. *Cf. Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000) (concluding that trial court erred by combining five invalid DTPA theories with eight valid DTPA theories in single jury question). Accordingly, we hold that there is no reversible error in the court's refusal of the County's proposed liability question.

We overrule the County's first issue.

**Evidentiary Challenges**
**Excluded Evidence on Dangerousness of Dioxin**

In its second issue, the County argues that the trial court erred by excluding its evidence of dioxin's dangerousness to people and the environment, including erroneously excluding expert testimony and government reports on the dangers presented by dioxin and, by extension, the sludge pits.

32

## A.     Standard of review

We review a trial court's exclusion of evidence under the abuse of discretion standard. *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 142 (Tex. 2016). A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if it acts arbitrarily or unreasonably. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). A trial court does not abuse its discretion by simply ruling differently than the appellate court would. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see Low*, 221 S.W.3d at 620.

To obtain reversal of a judgment based on error in the exclusion of evidence, the appellant must show (1) the trial court did in fact commit an error and (2) the error probably resulted in an improper judgment. TEX. R. APP. P. 44.1(a); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). This usually requires a demonstration that the judgment turns on the excluded evidence. *Interstate Northborough*, 66 S.W.3d at 220. We will uphold the trial court's evidentiary ruling if it is correct under any legal theory. *Columbia Med. Ctr. Subsidiary, L.P. v. Meier*, 198 S.W.3d 408, 411 (Tex. App.—Dallas 2006, pet. denied).

## B.     Exclusion of the County's expert testimony on causation and public health hazard

Before trial, the trial court granted IP's motions to exclude expert testimony on two topics: (1) a general causation opinion that dioxin is capable of causing

cancer in humans[15] and (2) a risk assessment opinion that dioxin at the sludge pits created serious health risks, largely because of its carcinogenic nature.

IP's first expert challenge addressed the opinions of James Olson, a toxicologist. IP objected to his general causation opinion on the grounds of a lack of a scientifically reliable foundation or methodology and that his "blind" reliance on the Public Health Assessment document was unreliable. IP also asserted a Rule 403 objection, arguing that the evidence was properly excluded, given the minimal probative value of the evidence to the liability question compared to the highly prejudicial effect of "cancer" evidence, particularly given the cumulativeness of such evidence in light of IP's stipulation that dioxin is a "dangerous" substance. *See* TEX. R. EVID. 403.

In support of its reliability challenge, IP relied primarily on *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706 (Tex. 1997), and its progeny to argue that Olson's opinion was inadmissible because he failed to (1) rely on epidemiological studies that show a doubling of the risk and (2) compare the exposure level modeled for the sludge-pit site with the exposure levels in epidemiological studies. It further argued that Olson "made no effort to methodically

---

[15]     A general causation opinion is an opinion on "whether a substance is capable of causing a particular injury or condition in the general population." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997).

collect and review the primary epidemiological literature." IP objected to his risk assessment opinion on the grounds that he was not qualified and did not utilize a reliable methodology.

The County does not argue that Olson's opinions are based on epidemiological studies that satisfy *Havner*. Instead, it argues that *Havner* does not apply to either of Olson's opinions. We only address Olson's first opinion—the causation opinion—because the County did not preserve its arguments on his second opinion, the risk assessment opinion. IP argued in the trial court that Olson was not qualified to offer his risk assessment opinion. It cited portions of his deposition in which he conceded that he has "no regulatory experience," and it argued that he lacked credentials as a public health expert. The County does not address these qualification arguments in its briefing, and therefore has not preserved any error on the trial court's exclusion of Olson's risk assessment opinion. *See* TEX. R. APP. P. 38.1(i).

We turn, then, to Olson's excluded general causation opinion—that dioxin is capable of causing cancer in humans—and the excluded government reports, including the October 2012 Public Health Assessment produced for the sludge-pit site by the Agency for Toxic Substances and Disease Registry ("ATSDR").[16]

---

[16]    The County also points to excluded fishing advisories, but those excluded documents discussed risk assessments, not a causal link between dioxin and cancer.

**C. Exclusion of general causation opinion and documentary evidence, if error, was harmless**

Even assuming the trial court erred by applying *Havner* in the civil-penalties context and requiring the County to establish a doubling of the risk, we must conclude, given our earlier holdings, that such error is harmless. The parties stipulated that dioxin was a dangerous substance. Given that stipulation, the degree to which dioxin might be considered dangerous, or even carcinogenic, is not the material or dispositive issue in this case. The liability question properly submitted to the jury did not ask it to find from among varying degrees of dangerousness. Instead, it asked whether IP caused or allowed the disposal of waste containing dioxin in such a manner so as to cause the discharge of waste containing dioxin. The jury answered the question "no."

The degree of dangerousness of the substance alleged to have been discharged does not bear on the initial determination of whether it was discharged in violation of the statute. Accordingly, the excluded evidence of dangerousness was not controlling on a material issue dispositive to the case and cannot be said to probably have resulted in an improper judgment. *See Interstate Northborough*, 66 S.W.3d at 220 (discussing standard of review on evidentiary challenges).

As mentioned above, the County waived its argument regarding excluded risk-assessment evidence; therefore, we do not address the fishing advisories.

36

We overrule issue two.

**Charge Error**
**Instructions Given Over Objection**

In its third and fourth issues, the County contends that the trial court erred by including two instructions in the liability questions. The first instruction states that IP no longer owned the waste. The second is an instruction that the "mere fact" that IP generated the waste and contracted with a company for its disposal is not, by itself, sufficient to establish that IP is liable for any discharge.

**A.      Standard of review**

We review the decision of whether to submit a particular instruction for an abuse of discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006); *Hamid*, 369 S.W.3d at 295. A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003). "The essential inquiry is whether the instruction or definition aids the jury in answering the questions." *Hamid*, 369 S.W.3d at 295. A court has wide latitude to determine the sufficiency of explanatory instructions and definitions. *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 791 (Tex. 1995).

An instruction is proper if it assists the jury, is supported by the pleadings or evidence, and accurately states the law. *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002). A jury instruction is improper if it comments on the weight of

the evidence or "nudge[s]" or "tilt[s]" the jury. *Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 724 (Tex. 2003); *Hamid*, 369 S.W.3d at 295. It can be error to give a jury instruction even when the instruction is a substantially correct statement of the law. *Liberty Mut. Ins. Co. v. Camacho*, 228 S.W.3d 453, 460 (Tex. App.— Beaumont 2007, pet. denied).

Rule 277 provides as follows:

The court shall not in its charge comment directly on the weight of the evidence or advise the jury of the effect of their answers, but the court's charge shall not be objectionable on the ground that it incidentally constitutes a comment on the weight of the evidence or advises the jury of the effect of their answers when it is properly a part of an instruction or definition.

TEX. R. CIV. P. 277. An impermissible comment on the weight of the evidence occurs when, in light of the entire charge, the judge has "assumed the truth of a material controverted fact or exaggerated, minimized, or [withdrawn] some pertinent evidence from the jury's consideration." *Tex. Mut. Ins. Co. v. Boetsch*, 307 S.W.3d 874, 879–80 (Tex. App.—Dallas 2010, pet. denied). An instruction is also an improper comment on the weight of the evidence if it suggests to the jury the trial judge's opinion concerning the matter about which the jury is asked. *Id.* at 880.

## B.    Ownership instruction was not erroneous

The County stated in its opening statement: "[This case] is not about whether you own the property. . . . It's not about whether you only generated the sludge. It is about whether you caused, suffer, allow, or permit the pollution of the waters of the

38

State of Texas." Later the County told the jury, "[Y]ou're going to hear . . . an interesting discussion between [IP] and MIMC about who owned the sludge," explaining that each would disclaim ownership. The County clarified, "Again, we don't think the law permits you to escape liability whether you claim you owned it or didn't own it. It's whether you caused, suffered, allowed, or permitted the pollution of the waters of the State of Texas." Shortly after that, the County said again that "the language 'cause, suffer, allow' doesn't require anybody to own the sludge. They just have to have the power to stop the sludge from getting into the river."

At the close of evidence, IP moved for a directed verdict on ownership, requesting that the trial court determine as a matter of law that it did not own the waste within the penalty period. During the discussion of the motion, the trial court observed, "Harris County has always been very definite in the view that legal ownership of the site . . . is not the key inquiry with regard to . . . these statutes." The trial court granted IP a directed verdict that it did not own the waste after the waste was placed at the site. After the court's decision to grant IP's motion for directed verdict and the charge conference, MIMC, which then faced the prospect that the

court or jury might determine that it owned the sludge, announced that it had settled with the County.[17]

With MIMC out of the case, the County's final argument focused on IP's failure to do anything to prevent the dioxin discharge.[18] The County emphasized that its case was not simply about a discharge happening, but about IP's failure to stop it.[19] It focused on the same abandonment and failure-to-maintain theories it first presented in opening statement.[20] The County returned to its failure-to-warn theory,

---

[17] The trial court, by that time, also had stated that it was "leaning" toward holding that MIMC had beneficial ownership or a purchase money resulting trust arising from the purchase of the 20-acre site by its employee Virgil McGinnes.

[18] The County made the following assertions in its final argument:
- "[IP] did nothing to contain the paper mill sludge laced with dioxin during the penalty period."
- "[IP] did nothing after the [EPA released its] '5 Mill Study,'" which analyzed five paper mills, including an IP mill, and found dioxin in the sludge.
- "[After] the site was underwater, [IP] did nothing about that sludge to stop it from getting into the river."
- "[After the 1989 survey showed] these pits were inundated and submerged beneath the waters of the San Jacinto River, . . . [IP] did nothing with respect to this site."
- "[IP] did nothing in response to knowing about the pollution problem at the site, [it] did nothing to investigate, nothing to report, and nothing to follow up."

[19] The County argued, "This is a case . . . about a company that did not follow its obligations under the law and, as a result, it should pay a penalty, as required by the law. The law says that, if you cause, suffer, allow pollution of the waters of our state, you should pay a penalty."

[20] The County argued the following:
- "[IP] has presented no evidence of anything [it] did to stop this sludge containing dioxin from getting out into the river that runs through the heart of our county."
- "[IP] left the sludge it produced in the waste pits and abandoned it."

arguing that IP knew by the mid-1980s that paper mill sludge contained dioxin and that dioxin was dangerous.[21] It also argued its failure-to-inspect theory, stating that IP never investigated the condition of the site after it was filled and abandoned.[22]

<hr />

- "[T]he 1973 photo show[s] the breach in the berm because there was no maintenance, no action was taken with regard to this site, no concern about what might happen to it."
- "[Pardue] testified that there is no record of any maintenance of the berms from February 15th, 1973 through March 30th, 2008; that the breach in the impoundments from February 15th, 1973 forward caused daily releases."

But the County's failure-to-maintain theory was undermined by the testimony of both IP's expert and its own. The County's expert, Davis Ford, testified that IP had no legal duty to maintain the site. Zoch, an IP expert, also testified that there was no duty to maintain the site.

[21] The County told the jury,
- "From 1985 it was known that the paper mill sludge containing dioxin may be hazardous to people or in the environment; and neither Champion nor International Paper warned anyone about the hazardous dioxin in their sludge."
- "[IP] was part of th[e EPA] study [on paper mill sludge] and [IP] knew during that study that its paper mill sludge contained dioxin, which was hazardous— which the EPA had designated as a hazardous substance in 1985."
- "[After] 1973 . . . [IP made] no effort to warn anybody about what happened to the site."
- "[IP] did nothing with respect to warning anybody about dioxin at the site, didn't so much as put up a sign, didn't attempt to warn anybody, didn't take any action with respect to stopping the dioxin at the site. [It] did nothing to warn anybody about dredging at the site. [It] didn't alert anyone about the existence of this site. [It] washed [its] hands of the sludge that [it] produced from [its] mill and did nothing with respect to warning anybody about dredging, even though [it] knew that it was on the banks of the San Jacinto River."
- IP knew that "its paper mill sludge was laced with dioxin; and it did nothing to go back and figure out, to stop, to warn, to do anything to stop that from happening on a daily basis."

[22] According to the County,
- "The evidence is also undisputed that after [the EPA study showed that paper mill sludge had dioxin in it], no one at [IP] went back and looked into what was

41

On appeal, the County contends that the trial court erred when it instructed the jury that IP did not own the waste as of 1966 because there was "no evidence of a contractual agreement that ownership would pass from the waste generator to another entity" and there was at least some evidence that IP continued to own the waste because IP generated this waste and arranged for its disposal. The County asserts that IP "does not identify any bill of sale or other agreement transferring the ownership of its sludge to another entity, and there is no such document in the record."

IP does not dispute that it generated the sludge and contracted for its disposal but contends that ownership transferred as of 1966 as a matter of law because the disposal agreement between IP and MIMC transferred ownership of the sludge to MIMC. The disposal agreement between IP and MIMC did not directly state that it transferred ownership of the sludge to MIMC. But IP argues that "the only reasonable interpretation of the Disposal Agreement is that [IP] relinquished ownership of the waste to the waste hauler (MIMC)."

When interpreting a contract, our primary concern is to give effect to the parties' intent as objectively manifested by the contract's words. *Frost Nat'l Bank*

---

going on at the site where [it] had transported or had MIMC transport [its] sludge."
- "After [the EPA paper mill study, IP did not] go back to the site underlying this lawsuit and conduct any sort of investigation into what was contained within the parameters of the site."

*v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005). Whether a contract is ambiguous is a question of law, which we review de novo. *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 313 (Tex. App.—Houston [1st Dist.] 2011, no pet.). We must enforce an unambiguous contract as written. *Tellepsen Builders, L.P. v. Kendall/Heaton Assocs., Inc.*, 325 S.W.3d 692, 696 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

A contract is ambiguous if its meaning is uncertain or reasonably susceptible to more than one meaning, but it is not ambiguous solely because a disagreement exists over the contract's meaning. *DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). In determining whether a contract is ambiguous, we must consider all of its provisions, the context of the agreement, and the circumstances present when the contract was signed. *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 104 (Tex. App.—Houston [1st Dist.] 2013, no pet.). If a contract is ambiguous, we may then consider parol evidence of the parties' intention. *Id.*

IP and the County disagree over whether IP transferred *ownership* or *possession* of the sludge to MIMC under the disposal agreement. Texas law distinguishes between ownership and possession; possession means the temporary "control of the property" and does not, in itself, indicate ownership or title to the property. *Seigal v. Warrick*, 214 S.W.2d 883, 884–85 (Tex. App.—Amarillo 1948, writ ref'd n.r.e.). An owner has more rights than a "mere" possessor of property; for

43

example, it has the rights to title to the property and to "override or negate" the possessor's rights. *See id.*; *In re Garza*, 984 S.W.2d 344, 347 (Tex. App.—Amarillo 1998, no writ).

Three provisions of the disposal agreement establish that IP transferred ownership—and not temporary control or possession—of the sludge to MIMC. First, the disposal agreement classified the sludge as "waste sludge" and referred to the sludge as "waste" several times. A person, generally, does not intend to continue to own "waste" after the waste-hauler has removed it from the generator's possession; the waste-generator intends to divest itself permanently of ownership of the waste. *Cf. Ind. Waste Sys. of Ind., Inc. v. Ind. Dep't of State Revenue*, 644 N.E.2d 960, 961 (Ind. T.C. 1994) (trash collector "owns the garbage it removes from its customers"); *Waste Recycling, Inc. v. Se. Ala. Solid Waste Disposal Auth.*, 814 F. Supp. 1566, 1575 (M.D. Ala. 1993) (describing waste as "something [the generator of the waste] most heartily do[es] not want"); *Masgai v. Pub. Serv. Comm'n of Pa.*, 188 A. 599, 601 (Pa. Super. Ct. 1936) ("[E]ven though the owner desires to dispose of or destroy such materials, the right of property continues until disposed of or destroyed."). By describing the sludge as "waste," IP indicated its intent to relinquish ownership of the sludge.

Second, the contract required that MIMC "procure" the land to deposit the sludge, "transport" the sludge to that land, and "deposit" the sludge there. These

44

actions indicate that IP intended to permanently transfer ownership of the sludge to MIMC; a waste-generator does not intend for a waste-hauler to "deposit" the waste and later return that waste to the waste-generator. *Cf. Franklin v. Jackson*, 847 S.W.2d 306, 308–09 (Tex. App.—El Paso 1992, writ denied) (ownership does not pass when contract "expressly or impliedly requires that the property be returned" to original owner). At the time of its disposal, paper mill sludge deposited in a sludge pit was understood to quickly solidify, such that heavy equipment would be necessary to remove it. The contract does not indicate an intention to place or store the waste in a manner for IP's later extrication of it from the land.

Third, the contract stated that MIMC was an "independent contractor" that had "full rights and authority to determine the means and methods of" disposing of the sludge. This provision indicates that IP intended to rely on MIMC to lawfully dispose of the sludge, similar to individuals who leave their waste for a trash collection company and rely on it to lawfully dispose of the waste.

The County asserts that the disposal agreement could not transfer ownership from IP to MIMC because (1) IP retained control over the waste through its contract with MIMC and (2) a person cannot abandon toxic waste. We reject both arguments.

The County points to four provisions in the disposal agreement that it contends show that IP retained control—and, thus, ownership—of the waste: (1) IP was required to approve the tract of land on which MIMC would dispose the waste;

45

(2) the contract specified that the sludge would be transported by a barge; (3) the contract required MIMC to comply with all laws, rules, and regulations; and (4) IP had the right to audit MIMC's financial records. None of these provisions show that IP retained control of the waste.

The first contract provision—the provision granting IP the right to approve the land—does not indicate that IP intended to retain ownership of or control over the sludge. MIMC determined the land on which to dispose of the waste—not IP. IP's veto-power of the land selection did not indicate its desire to control the *waste*. Instead it could have reserved that right to protect another of its interests: for example, IP may have wanted to avoid negative publicity by allowing MIMC to dispose of the sludge near a residential neighborhood or it may have wanted to ensure the sludge did not interfere with its operations.

The second contract provision—the requirement that MIMC transport the sludge "by barge" from IP's facilities—also does not indicate that IP intended to retain ownership of the sludge. Again, this provision may have been included to protect IP by ensuring that its plant's operations were not disturbed by MIMC's method of transporting the waste.

The third contract provision required MIMC to comply with "governmental laws, rules and regulations," and "secure and keep in effect all permits and licenses required in connection with the performance of the work." But these provisions do

not interfere with MIMC's ability to "determine the means and methods of" lawfully disposing of the waste or indicate that IP "controlled" the sludge. *See Tri-State Grp., Inc. v. Ohio Edison Co.*, 782 N.E.2d 1240, 1246 (Ohio Ct. App. 2002) (holding that contractual provision requiring waste-disposal company to carry insurance and obey all laws but otherwise leaving open disposal method did not indicate that waste generator retained ownership of waste).

The final provision required MIMC to "maintain suitable records of all charges pertaining to this Agreement and make such records available to [IP] upon its request." This provision does not indicate that IP intended to retain control over the sludge either. The contract only requires MIMC to maintain records of "charges"—not of MIMC's disposal activities. Thus, none of the contract provisions that the County refers to indicate that IP retained ownership or control of the sludge.

Next, we turn to the County's second ownership argument: that under *Railroad Commission of Texas v. Waste Management of Texas, Inc.*, a generator of toxic waste cannot abandon the toxic waste because it has a continuing duty to ensure that the waste is disposed of in accordance with the relevant environmental laws. 880 S.W.2d 835, 843–44 (Tex. App.—Austin 1994, no writ) (stating that, although "it seems to us highly unlikely that a generator of asbestos-containing solid waste could *ever* 'abandon' such waste in the true sense, because a generator has a continuing duty to see that the waste is disposed of in accordance with the SWDA,"

47

appellate court need not decide that issue). According to the County, because IP could not abandon toxic waste, the trial court erred by concluding that ownership transferred as a matter of law in the absence of a contractual transference.

The County's reliance on the Austin court's "abandonment" statement, which is dicta, is misplaced for two reasons. First, even if it is accurate that environmental-protection laws do not permit an entity to "abandon" toxic waste, the existence of such laws creating a continuing duty does not turn on the ownership issue and thus does not resolve the ownership issue when IP and MIMC contracted to dispose of waste (1) that both agreed at the time was non-toxic (2) in an era that predated the environmental waste-disposal rules the County cites. In *Waste Management*, in contrast, the parties knew the waste contained a toxic substance, asbestos. It is undisputed that IP did not know that the sludge contained dioxin when the waste was disposed. Nor was dioxin considered toxic at the time. The contract stipulated that "[t]he sludge to be removed by Contractor is not considered by the parties to be inherently harmful or dangerous but it is recognized that any spillage of the sludge would create an untidy condition and impede the use of the road or ground upon which such spillage occurred." Because all parties believed that the sludge was non-toxic common "waste," the issue of whether an entity might be prohibited under current laws from abandoning its waste reveals nothing about the parties' intentions as expressed in their contract.

Second, and more importantly, as the County acknowledges, the abandonment analysis becomes relevant only if there is no contract that transferred ownership.[23] We already have concluded that ownership was transferred under the terms of the contract. Thus, the abandonment inquiry is irrelevant.

We conclude that the trial court did not misstate the law in instructing the jury that IP did not own the sludge.[24] In any event, the instruction is harmless given that the County's liability theory was that ownership was not required for it to prevail. The County consistently took the position—both before and after the trial court formulated its jury instructions—that the law did not require it to prove ownership of the waste. The court's instruction does not suggest otherwise; it aided the jury that heard conflicting evidence on the ownership of the waste. Because ownership is not

---

[23]    The County states in its appellate brief the following:

> Because there is no contractual agreement transferring the ownership of the sludge from [IP] to another entity, the only way the ownership could be transferred is by operation of law.
> . . . .
>
> Under Texas law—absent an agreement transferring ownership—the ownership of waste is not transferred unless the waste owner has abandoned the waste. Because there was no agreement transferring ownership of the sludge, International Paper had to conclusively establish that it abandoned the sludge.

(Internal citations and footnotes omitted.)

[24]    Because we hold that the disposal agreement transferred ownership of the waste to MIMC, we do not address IP's other ownership arguments.

49

an element for liability and the County made this clear throughout the case, even if the instructions were error, it would be harmless.

We overrule the County's third issue on the ownership instruction.

## C. Generating-waste instruction was erroneous but harmless

In its fourth issue, the County challenges the trial court's jury instruction in the liability questions that "the mere fact that [IP] generated the waste and contracted with an independent waste disposal company for its disposal is not, by itself, sufficient to establish that [IP] is liable for any discharge." We conclude that the instruction was legally correct, but it was nonetheless error to include it. Such error, however, was harmless and did not lead to an improper judgment.

### 1. Although legally correct, the instruction erroneously commented on the weight of the evidence

An impermissible comment on the weight of the evidence occurs when, in light of the entire charge, the judge has "assumed the truth of a material controverted fact or exaggerated, minimized, or [withdrawn] some pertinent evidence from the jury's consideration." *Boetsch*, 307 S.W.3d at 879–80. An instruction is also an improper comment on the weight of the evidence if it suggests to the jury the trial judge's opinion concerning the matter about which the jury is asked. *Id.* at 880.

IP argues that generating and contracting for disposal that eventually results in a discharge is not, in itself, a violation of the SWDA. We agree. The SWDA is not a strict liability statute in the sense that liability exists simply by proving that a

50

company generates and disposes of waste; it requires a finding tantamount to a statutorily defined wrong. Under the SWDA, the wrong is causing or allowing the disposal of waste in a manner that causes a discharge (or nuisance or endangerment). 30 TEX. ADMIN. CODE § 335.4. But the fact that a jury instruction is a correct statement of the law does not mean it should be included in the court's charge, nor does it prevent the instruction from being an improper comment on the weight of the evidence. *See Acord v. Gen. Motors Corp.*, 669 S.W.2d 111, 116 (Tex. 1984) (in closely contested case, jury instruction that stated that General Motors was neither insurer nor guarantor of accident-proof product was impermissible comment on case); *Maddox v. Denka Chem. Corp.*, 930 S.W.2d 668, 671 (Tex. App.—Houston [1st Dist.] 1996, no writ) (noting that every correct statement of law does not belong in jury charge and holding that surplus instruction on duty tended to lead jury to particular answer and suggested judge's opinion on issue).

By singling out a particular fact with the expression "mere fact," the court's instruction constituted a comment on the weight of the evidence. *See Boetsch*, 307 S.W.3d at 879–80 ("An impermissible comment on the weight of the evidence occurs when, after examining the entire charge, it is determined that the judge . . . exaggerated, minimized, or withdrew some pertinent evidence from the jury's consideration."). The use of the adjective "mere" in a jury instruction—when the court told the jury that the "mere fact" of generating and contracting for disposal "by

51

itself" is not sufficient to establish liability—is generally improper because it highlights the instruction. *See Lemos v. Montez*, 680 S.W.2d 798, 801 (Tex. 1984) (reversing based on jury instruction that "mere happening of a collision of motor vehicles is not evidence of negligence."); *Acord*, 669 S.W.2d at 116. We conclude that the trial court erred in giving the instruction.

### 2. Error was harmless

Reversal is required if a jury charge includes an improper comment on the weight of the evidence and the instruction was calculated to cause and probably did cause the rendition of an improper judgment. *M.N. Dannenbaum, Inc. v. Brummerhop*, 840 S.W.2d 624, 631 (Tex. App.—Houston [14th Dist.] 1992, writ denied). In making this determination, we must consider the parties' pleadings, the trial evidence, and the charge in its entirety. Alleged error is reversible only if, when viewed in the light of the totality of these circumstances, it amounted to such a denial of the rights of the complaining party as was reasonably calculated to cause and probably did cause the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1); *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986). The Texas Supreme Court has "recognized the impossibility of establishing a specific test for determining harmful error, and thus ha[s] entrusted the matter to the sound discretion of the reviewing court." *Caffe Ribs*, 487 S.W.3d at 145.

The court's charge broadly defined the phrase "cause, suffer, allow or permit." After first stating that the jury should apply the ordinary meanings to these words, the charge further explained that IP caused, suffered, allowed, or permitted a discharge if it "had the power to prevent an event at the time of the event, but failed to do so." In other words, the jury was instructed, in effect, that IP was liable for a discharge by a third person, if it "had the power to prevent an event at the time of the event, but failed to do so." With this broad definition, which is not challenged on appeal, the court's instruction told the jury that two facts—IP's production of the waste and IP's hiring of MIMC to dispose it—did not, by themselves, establish that IP caused, suffered, allowed, or permitted the discharge.

The instruction was consistent with the County's theory of the case and was what the County told the jury throughout the trial.[25] The consistency between the

---

[25]    From the beginning of trial, the County readily accepted that something more than generating the waste and contracting for its disposal was required to establish liability. According to the County, IP was liable if it could prove that, in addition to generating the waste and contracting with MIMC to dispose of it in the pits next to the San Jacinto River, IP did any of the following four acts or omissions: (1) abandoning or failing to maintain the site, thereby allowing river water to mingle with the dioxin-containing sludge by 1973 despite the County's earlier directions that the site was acceptable only if it did not allow waste into the river; (2) failing to take action to notify government authorities of the risks when the river was already beginning to cover the pits in 1973; (3) failing to notify government authorities when it learned in 1985 that dioxin is a hazardous substance; and (4) failing to notify government authorities when it learned in 1987 that papermill sludge contained dioxin or when the pits became more and more inundated with water. All of these theories required more than proof that IP generated and disposed of the waste and that a discharge occurred. Indeed, the date limitation included in the charge—1973 to 2008—informed the jury that liability required acts or

53

court's instruction and the County's liability theory is shown in the opening statement that was given weeks before the trial court gave this instruction. During its opening, the County repeatedly stated that IP's liability was not based simply on generating the sludge and disposing of it in the pits. It stated, "This case is not about putting the paper mill sludge in the impoundments at the beginning." It stated, "And, again, I want to go back to the fact that this case is not about putting it in the site." Instead the case was "about [what] happened after and the failure to maintain and look after the sludge for the next 35 years." And, "This case is about letting it get into the water for 35 years of violation." Again, "This is about 35 years of violations, not the early period of time." In other words, the events that created liability were not the generation and disposal in the 1960s (50 years ago) but acts and omissions beginning in the 1970s (40 years ago).[26] The County made numerous other statements in the opening, asserting IP's misconduct between 1973 and 2008.[27] The

omissions between those dates, not when the waste was generated and disposed of in the pits in the 1960s.

[26] To be precise, because the specified penalty period for SWDA-based liability was from 1975 to 2008, the County was suing for conduct over a 33-year period.

[27] According to the County, MIMC and IP "abandoned [the pits] for 40 years" and failed to "warn anyone about the hazardous dioxin in their sludge." IP "did nothing to stop their sludge laced with dioxin from getting into the river." It failed to "maintain the [pits] or go back out to the site." When the site became submerged, no one from MIMC or IP "went out to maintain it, to inspect it, to make sure that the paper mill sludge stayed out of the waters of the San Jacinto River." "[T]he failure to maintain the levees resulted in a breach in the levees starting in 1973, and that's how by mid-1989, 14.05 acres of the site of the 20 acres were submerged

54

County's arguments required it to show something more than (1) a discharge and (2) the generation and disposal of waste through a contract with MIMC.

Thus, long before the jury instruction, the County framed the issue to the jury as whether IP had the power to prevent the discharge of dioxin from the pits, with the County repeatedly explaining that what occurred in the 1960s—which was the generating of the sludge and contracting for its disposal—was not what it was suing over; instead, it was suing over what IP failed to do from 1973 to 2008. That was the "something more" that the County told the jury it was required to prove. That is what the jury rejected in its verdict. When the trial court gave this instruction, it was error

---

below the San Jacinto River, and how that contamination from 1973 continued to release daily for the next 35 years."

Neither MIMC nor IP "told the public or the government that they had intentionally abandoned the pits." When the EPA determined in the mid-1980s that paper mill sludge contained dioxin, MIMC and IP "didn't go back at any time and determine what was in the sludge." IP never went back after this paper mill study to see if the pits contained dioxin or to "do something about it." For the entire penalty period, the County argued, IP "remained silent as waste ponds containing its dioxin waste were engulfed by the San Jacinto River." It was silent from the mid-1980s on, when "it had to know that the dioxin was in its sludge" because "the EPA had determined that dioxin was hazardous. . . . For more than 35 years, [IP] caused, suffered, allowed, and permitted its dioxin to release into the San Jacinto River, and the law provides for a fine for every day of that release."

Finally, the County contended that MIMC and IP ultimately were responsible for the commercial dredging in the early 2000s that the State of Texas permitted and that indisputably contributed to the dioxin discharge because the dredging would not have occurred if they had warned government authorities of the dioxin in the pits that were then covered by the San Jacinto River. No warning was given because neither company "continue[d] to maintain or inspect their sludge pits."

because it highlighted for the jury that the early actions were not enough for liability without more—but the error was harmless in the context of this record where this statement had already been made repeatedly by the County.

We overrule the County's third and fourth issues.

## Conclusion

We affirm.

Harvey Brown
Justice

Panel consists of Justices Bland, Brown, and Lloyd.